**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| PFIZER INC., | : |
|   Plaintiff, | : |
| v. | : Civil Action No. <u>3:22-cv-190</u> |
| REGOR THERAPEUTICS INC., QILU | : |
| REGOR THERAPEUTICS INC., XIAYANG | : **JURY TRIAL DEMANDED** |
| QIU, MIN ZHONG, and DOES 1-10, | : |
|   Defendants. | : |

## COMPLAINT

Plaintiff PFIZER INC. ("Pfizer"), through its undersigned attorneys, Davis Polk & Wardwell LLP and Wiggin and Dana LLP, as and for its Complaint against Defendants REGOR THERAPEUTICS INC., QILU REGOR THERAPEUTICS INC., XIAYANG QIU, MIN ZHONG, and DOES 1-10 (collectively, "Defendants"), respectfully alleges, upon knowledge and upon information and belief, as follows:

## NATURE OF THE ACTION

1.      Pfizer's guiding principle is the pursuit of breakthroughs that change patients' lives. Pfizer runs dozens of programs, from preclinical research and development through clinical trials to manufacturing and delivery of innovative, life-changing medicines.  Some of these programs succeed while others do not; cutting-edge science requires significant trial and error, and sometimes programs can last many years before yielding a scientifically and commercially viable solution.  But as Pfizer-BioNTech's COVID-19 vaccine demonstrated, those solutions that are viable contribute to a better, healthier world for all.

2.      One of Pfizer's programs focuses on addressing two major American public-health crises:  Type 2 diabetes and obesity.  Tens of millions of Americans suffer from Type 2 diabetes, and tens of millions more Americans are considered "pre-diabetic" due to their increased risk of

developing Type 2 diabetes.  And more than one-third of adults in the United States are obese, yet only a handful of obesity treatments have won FDA approval, with highly invasive bariatric surgery considered the most effective.  Since 2002, Pfizer has devoted thousands of hours of its scientists' and clinicians' time and hundreds of millions of dollars in research to develop a revolutionary new diabetes-and-obesity treatment.  These efforts have included screening thousands of possible compounds before identifying a narrower set of promising novel clinical candidates, and ultimately proceeding to FDA clinical trials with two of them.

3.       Defendants Min Zhong and Xiayang Qiu, based on years of working at Pfizer, saw the promise of Pfizer's diabetes-and-obesity treatment in development.  Instead of carrying out their ethical and contractual responsibilities as Pfizer employees, they decided to steal the hard work of Pfizer's scientists and clinicians for their own profit and gain.  While still employed at Pfizer, Zhong and Qiu set up Defendant Regor Therapeutics ("Regor") on the side, met with international financial backers to fund Regor, and co-opted Pfizer's investment and hard work, all to benefit themselves, Regor, and a second company they founded, Defendant QILU Regor Therapeutics ("QILU Regor").  The Pfizer trade secrets and confidential information that Qiu and Zhong stole essentially gave Defendants the playbook and the critical underlying science and data to develop their own supposed diabetes-and-obesity treatment, an unlawful head start that saved Defendants significant money and years of development time.

4.       As part of their intentional scheme, Defendants stole key Pfizer trade secrets and confidential information for weeks before they gave notice of their intent to leave Pfizer, taking advantage of their privileged position as Pfizer employees to do so.  As just one example, Defendants purported to create a new presentation about a revolutionary new diabetes-and-obesity drug, but populated it with content copied directly from several confidential Pfizer documents that

reflected key development and planning aspects of *Pfizer's* revolutionary GLP-1 program. Defendants specifically stripped their "new" presentation of Pfizer confidentiality designations so as to avoid detection and uploaded it to a personal cloud-storage account for no apparent business reason just two months before their departure.

5.      Equally telling of their scheme is the fact that, within just a handful of months of founding Regor and QILU Regor, Defendants applied for patent protection as to a treatment strikingly similar to Pfizer's diabetes-and-obesity treatment.  Without the critical head start Zhong and Qiu's theft provided, Defendants could not have "developed" their own purported treatment in such a short amount of time.

6.      Pfizer discovered Defendants Zhong and Qiu's theft from a forensic analysis of their Pfizer accounts and devices—or at least those accounts and devices to which Pfizer has access.  Unbeknownst to Pfizer at the time of Zhong's departure, he turned in an iPhone that was not his own, and Zhong's Pfizer-issued iPhone has not been recovered.  Pfizer conducted its analysis after it first suspected Defendants' treachery upon publication of Regor's patent application that claimed the fruits of Pfizer's years-long research.  What is more, Defendants have now enticed Eli Lilly and Company ("Eli Lilly") to invest up to $1.5 billion dollars in their business founded on the Pfizer trade secrets and confidential information they stole.

7.      Pfizer thus brings this action against Defendants for misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.* and the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 35-50, *et seq.*; unfair trade practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq.*; breach of fiduciary duty and breach of the duty of loyalty, under Connecticut law; and breach of contract under New York law.

## PARTIES

8.      Plaintiff Pfizer Inc. is a Delaware corporation, with its principal place of business at 235 East 42nd Street, New York, New York 10017.  Zhong and Qiu worked immediately before their departures from the company at Pfizer's Groton, Connecticut facility.

9.      Defendant Regor Therapeutics Inc. ("Regor") is a Delaware corporation, with its principal place of business at 245 Main Street, Second Floor, Cambridge, Massachusetts 02142. Zhong and Qiu cofounded Regor while they were still employed by Pfizer.  Regor has filed at least one patent application for pharmaceutical products relying on stolen Pfizer trade secrets.

10.     Defendant QILU Regor Therapeutics Inc. ("QILU Regor") is incorporated in the People's Republic of China, with its principal place of business at 1206 Zhangjiang Road, Building C, Pu Dong New District, Shanghai 201210, China.  QILU Regor is a start-up entity that Defendants created with capital provided by drug manufacturers Qilu Pharmaceutical Co. Ltd. and Shandong Qilu Pharmaceutical Group Co., Ltd. (collectively, "Qilu").  Zhong and Qiu cofounded QILU Regor while they were still employed by Pfizer or shortly thereafter.  On information and belief, Defendants Regor, Zhong, and Qiu control QILU Regor and use it as another vehicle to develop pharmaceutical products and pursue patent applications relying on stolen Pfizer trade secrets and confidential information.

11.     Defendant Xiayang Qiu is a Connecticut citizen who owns a home in Connecticut.

12.     Defendant Min Zhong is a Connecticut citizen who owns a home in Connecticut.

13.     The true names and capacities, whether individual, corporate, associate or otherwise, of DOES 1 through 10 are unknown to Pfizer at this time, and therefore are sued by Pfizer using the pseudonyms DOES 1 through 10.  On information and belief, DOES 1 through 10 are individuals or corporations who acted or are acting in concert with Defendants in connection with the misappropriation of Pfizer's trade secrets and confidential information and/or knowingly

and intentionally have acquired, disclosed, and/or used Pfizer's trade secrets and confidential information.  Pfizer will amend this Complaint to state the true names and capacities of DOES 1 through 10 once they have been ascertained.

## JURISDICTION AND VENUE

14.     This action arises under the DTSA, 18 U.S.C. § 1836, *et seq.*, as well as under Connecticut and New York law.  The Court has subject-matter jurisdiction over Pfizer's federal cause of action (Count 1) pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).  The Court has supplemental jurisdiction over the remaining causes of action (Counts 2-4) pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Defendants because Zhong and Qiu are residents of the State of Connecticut, were employed by Pfizer at its Groton, Connecticut facility in this District, cofounded Defendants Regor and QILU Regor while residents of this District, and committed the misappropriation and other tortious acts alleged herein within this District while acting on behalf of themselves and the other Defendants.  A significant purpose of Zhong and Qiu's creation of Defendants Regor and QILU Regor was to make use of the trade secrets and other confidential information they were misappropriating from Pfizer in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this action occurred in this District at Pfizer's facility in Groton, Connecticut, which is where Zhong and Qiu regularly transacted business and misappropriated information and documents at the heart of this Complaint.

## FACTUAL BACKGROUND

I.     **Pfizer Commits Massive Resources to Researching and Developing New Therapies, Including a Promising, Innovative Oral Diabetes-and-Obesity Medication**

17.     Pfizer is committed to investing in research-and-development efforts that lead to breakthroughs in therapies and drugs that change patients' lives.   Against a complex health landscape, Pfizer unleashes the power of its assets to help strengthen health systems and improve access to quality healthcare services for patients around the world.   Pfizer seeks to unlock transformative and sustainable solutions through programs and investments geared toward achieving a healthier world for everyone.

18.     As a core part of its mission, Pfizer invests billions of dollars annually in research and development.   Pfizer employs thousands of scientists and clinicians and runs dozens of programs, from preclinical development through clinical trials to manufacturing and delivery of innovative, life-changing medicines.   Not all of these programs are successful; cutting-edge science requires significant trial and error, and sometimes programs can last many years before yielding a scientifically and commercially viable solution.

19.     One of Pfizer's programs focuses on solving a major public-health crisis:  Type 2 diabetes, a health condition in which insulin produced by the body is unable to adequately control blood sugar levels.   According to the Centers for Disease Control ("CDC"), tens of millions of Americans suffer from Type 2 diabetes, and tens of millions more Americans are considered "pre-diabetic" due to their increased risk of developing Type 2 diabetes.   The CDC notes that the total annual cost of diagnosed diabetes was estimated in 2017 to be $327 billion, including both direct medical costs and indirect costs related to absenteeism, inability to work, and reduced productivity.

20.     In the early 2000s, Pfizer took steps to address this major health need by investing and working to develop a new diabetes-and-obesity medication.   The medication would need to

stimulate the body's insulin production by mimicking a natural hormone called glucagon-like peptide 1, or GLP-1.  Injectable medications of this type based on naturally occurring GLP-1-like peptide, known as GLP-1 receptor agonists, are known and commercially successful (e.g., exenatide, liraglutide, dulaglutide); the current market for injectable GLP-1 receptor agonists is worth an estimated $8 billion annually.  But consumers strongly prefer oral medications over injections, and so there was a strong interest in developing a small-molecule-based oral medication with good metabolic stability and oral bioavailability.  Thus, Pfizer set out to develop a first-in-class small-molecule GLP-1 receptor agonist that could be delivered orally.

21.     Development of Pfizer's small-molecule GLP-1 receptor agonist has proven challenging, time-consuming, and extremely costly.  To date, Pfizer has spent hundreds of millions of dollars on research and development for its GLP-1 program.  For more than a decade, hundreds of Pfizer scientists have dedicated their efforts to this project, including development of innovative assays for hit-identification, high throughput screening of over tens of thousands of small-molecule compounds to identify the initial hit, and extensive lead optimization to improve compound properties that ultimately led to a set of potential oral drug candidates—the vast majority of which did not meet the stringent requirements for advancing to clinical testing.

22.     In addition to a large in-house team of scientists, Pfizer has employed a number of other Pfizer colleagues outside of the lab to provide internal support to the GLP-1 project.  Pfizer also has worked with external researchers and organizations on the GLP-1 project, entering into an agreement for biochemical and biophysical work on the GLP-1 receptor with a leading research institute, and collaborating with another research company to develop a high-resolution structure showing the interactions between Pfizer's small-molecule compounds and the GLP-1 receptor, with the goal of identifying features of those compounds that were particularly important to

efficacy.  In addition, Pfizer has worked with partners to conduct preclinical and clinical studies, such as toxicology studies, on its compounds.

23.     Through more than a decade of painstaking effort, Pfizer not only identified a number of active small-molecule GLP-1 receptor agonist compounds, but it also identified and focused on promising candidates for an oral medication.  On December 16, 2016, Pfizer filed a patent application describing over 250 small-molecule compounds identified during its fourteen-year-long research-and-development program, including the structures of active GLP-1 receptor agonist compounds.  Because patent applications are kept confidential until eighteen months after the first patent in the family is filed, the information in Pfizer's applications did not become publicly available until June 21, 2018—just over a week after Zhong and Qiu resigned from Pfizer.

24.     Today, Pfizer has not one, but two, candidate oral small-molecule GLP-1 receptor agonists in clinical trials.  Pfizer published favorable results from a Phase 1 trial of its first candidate, danuglipron, in 2021, and danuglipron is now undergoing Phase 2 clinical trials, which will evaluate its safety and efficacy in patients.  The first of those Phase 2 trials was completed in July of 2021, and another Phase 2 trial is ongoing.  Pfizer's second candidate oral small-molecule GLP-1 receptor agonist is currently in Phase 1 trials.

25.     Pfizer's massive investment in its small-molecule GLP-1 receptor agonist program, and the many years of effort required to advance candidates into Phase 1/2 clinical trials, reflects just how difficult it is to develop a viable oral GLP-1 receptor agonist medication.  Despite the clear benefits of oral delivery over injection, to date the FDA has approved only one oral GLP-1 receptor agonist medication for treating Type 2 diabetes.  That medication is a new formulation of an existing injectable medication called semaglutide, which is a peptide, not a small molecule, and typically not feasible to administer orally.  So far, no oral *small-molecule* GLP-1 receptor agonist

has received FDA approval, but such a medication would be expected to have many potential benefits, including greater absorption and efficacy, no requirement for pre-dose fasting, and suitability for both monotherapy and combination therapies. These advantages would make an oral small-molecule GLP-1 receptor agonist medication highly appealing to both prescribers and consumers.

26.     In addition to Type 2 diabetes, Pfizer's small-molecule GLP-1 receptor agonist candidates are currently being evaluated in Phase 1 and Phase 2 clinical trials for another serious, widely prevalent American disease:  obesity.  Only a handful of obesity treatments have won FDA approval; the most effective option is highly invasive bariatric surgery.  Because there are so few effective options, a new obesity treatment with the known advantages of an oral small-molecule medication remains in high demand.  For this additional reason, Pfizer's small-molecule GLP-1 receptor agonist technology is highly promising from both a clinical and commercial perspective— and the trade secrets and confidential information behind it would also be highly lucrative to a competitor looking to avoid Pfizer's substantial investment while reaping the commercial benefits.

II.     **To Protect Its Investments, Pfizer Safeguards Its Trade Secrets and Prohibits Current Employees from Launching Competing Enterprises**

27.     Pfizer takes significant steps to protect its innovations, including the highly confidential research-and-development work at issue in this case.  Pfizer employs a range of reasonable and industry-standard security measures to protect and secure its trade secrets and confidential information.

28.     By way of example, Pfizer employees sign employment agreements whereby they acknowledge the confidentiality of Pfizer information and agree to maintain that confidentiality. Pfizer maintains security policies and protocols that restrict the use and circulation of confidential information outside of Pfizer and limit the transmission of confidential information internally at

Pfizer to those with a need to know the information. Pfizer deploys credentials to restrict physical access to and within Pfizer's facilities, as well as passwords and related security protocols to restrict electronic access to computerized information. Pfizer also prohibits the unauthorized removal of Pfizer information, both physically and electronically, from Pfizer's facilities. Pfizer further provides regular training and follow-up measures to its personnel regarding its security and confidentiality policies, and it requires adherence to those policies as a condition of employment.

29.     Pfizer's security protocols extend to electronic devices such as iPhones and laptops. Pfizer does not allow Pfizer confidential information to be diverted outside of Pfizer's secure electronic environment through electronic devices, and it requires employees to surrender all company-issued phones and confidential information when they leave Pfizer. Pfizer similarly prohibits employees from diverting confidential Pfizer information to personal devices and email accounts.

30.     Additionally, Pfizer requires that its full-time employees devote their full time and attention to their Pfizer obligations. In written policies, contracts, and its code of conduct, Pfizer prohibits its personnel from engaging in conflicting employment or other conflicts of interest, such as joining start-up companies that could conflict with their Pfizer work, absent Pfizer's advance written consent. Pfizer trains its employees on these obligations and rigorously enforces them. Pfizer also seeks and secures assurances from its personnel that they will comply with these obligations.

31.     Defendants Qiu and Zhong are subject to these restrictions and obligations by way of their employment agreements with Pfizer (or predecessor entities), as reinforced by trainings and written policies.

32.     As part of Qiu's employment with Pfizer, Qiu signed an Employment Agreement dated December 17, 2001.  The Employment Agreement (a) precludes Qiu from "disclos[ing] or us[ing]" any "secret or confidential information" without the company's written permission, other than in the course of his employment; (b) provides that "the entire right, title and interest in and to" "any idea, discovery, invention, improvement, software, writing or other material or design conceived, made or developed by" Qiu "solely or jointly with others during the period of" his employment with the company, "whether patentable or not that relates in any manner to the actual or anticipated business operations, work, investigations or research of" the company, "shall belong to the Company"; (c) requires that, at the company's request, Qiu "will assign to the Company any application for letters patent or of trademark registration made thereon, and to any common-law or statutory copyright therein"; (d) precludes Qiu, during the term of his employment, from "engag[ing] in any activity in competition with or against the best interests of the Company" or being "employed by or participat[ing] in the ownership, management or control, or otherwise be[ing] affiliated [with] . . . any other business entity, or engage in any business which in any manner competes with the business" of the company without prior written consent; and (e) requires Qiu to "return within 48 hours" of termination of his employment "all Company materials within [his] possession, whether confidential or proprietary or that in any way relate[] to the business of the Company or any of its subsidiaries or affiliates."

33.     As part of Zhong's original employment with Pharmacia & Upjohn (a company that later was acquired by Pfizer), Zhong received an offer letter on May 4, 1999, that conditioned his employment on signing Pharmacia's Patent, Trade Secrets, and Copyright Agreement.  On information and belief, Zhong signed the offer letter and agreement.  A sample of the Patent, Trade Secrets, and Copyright Agreement, which on information and belief is substantially similar to the

agreement that Zhong signed, (a) restricts the employee from "us[ing] or disclos[ing]" any of the company's "inventions, improvements, confidential information and trade secrets" during or after his employment without the company's written consent; (b) provides that "any confidential information, trade secrets, improvements and inventions conceived or reduced to practice" by the employee, "either alone or with others" while employed by the company, so far as they "relate to the business, processes, apparatus, products, researches or research programs" of the company, "shall be regarded as made and held by" the employee in "a fiduciary capacity solely for the benefit of" the company, "shall not be disclosed to others without [the Company's] written consent, and shall be the sole and exclusive property of" the company; and (c) requires that the employee, "when requested so to do, either during or after said employment, shall assign to" the company his "entire right and title to said improvements and inventions and any U.S. and foreign patent applications and patents covering the same, and assist" the company in "obtaining, defending and enforcing any such right and title."

34.     The sample Patent, Trade Secrets, and Copyright Agreement also provides that the obligations set forth in the agreement are "[i]n consideration of the employment or continuation of employment of the Employee by [Pharmacia] or an affiliated company (affiliated company shall mean any corporation, firm, partnership or other entity which directly or indirectly controls, is controlled by, or is under common control with [Pharmacia])."

35.     Like their Pfizer colleagues, during their Pfizer tenures, Zhong and Qiu received training and written policies reminding them of these obligations.  Throughout their Pfizer tenures, Zhong and Qiu neither sought nor received Pfizer's permission to launch a competing business.  Like their Pfizer colleagues, Zhong and Qiu also received periodic training about their obligation under Pfizer policy to safeguard the confidentiality of Pfizer business information.  This training

advised that Pfizer's business information is a valuable company asset that must be protected from unauthorized disclosure, and it provided guidance about how to safeguard trade secrets, intellectual property, and other confidential information.  For instance, the training made clear that Zhong and Qiu were prohibited from transmitting Pfizer business information to personal email accounts and devices.  It also explained that violations of Pfizer's information security policies may result in termination and criminal or civil proceedings.  In addition to this specific training, many of Pfizer's policies explicitly concern the obligation of all Pfizer colleagues to safeguard Pfizer business information, including those described in Pfizer's Blue Book, the Acceptable Use of Information Systems policy, and Handling Sensitive Information guidelines.  Throughout their Pfizer tenures, Zhong and Qiu neither sought nor received Pfizer's permission to take or use Pfizer's trade secrets or confidential information for any non-Pfizer purpose.

## III.   Defendants Scheme to Steal Pfizer Trade Secrets and Other Confidential Information to Compete Unlawfully with Pfizer

36.     Qiu first joined Pfizer in 2001.  Zhong joined Pharmacia in 1999, and Pfizer acquired Pharmacia in 2003.  Qiu's work at Pfizer focused on the discovery of new therapeutic compounds and, in particular, evaluating how such compounds interact with proteins in the human body that may produce clinical benefit.  At the time of his resignation from Pfizer, Qiu's title was Executive Director of Structural Biology.

37.     Zhong worked with third-party research vendors to conduct bioanalysis of samples from toxicology studies of already-identified compounds.  At the time of his resignation from Pfizer, Zhong held the position of Director of Clinical Outsourcing for Pfizer's Pharmacokinetics, Dynamics & Metabolism ("PDM") group.  As explained in more detail below, both Qiu and Zhong had been working in different capacities on Pfizer's small-molecule GLP-1 receptor agonist technology when they left the company.

38.     Until their resignations in 2018, Zhong and Qiu each devoted time to Pfizer's GLP-1 program.  Qiu was responsible for analyzing the structure of the GLP-1 receptor, with the goal of identifying small-molecule agonist compounds that would effectively interact with that receptor.  He was also the lead Pfizer contact for the collaboration with another research company on the GLP-1 program.  Qiu was so important to the program that Pfizer named him to the Steering Committee that oversaw the development of a high-resolution structure of the GLP-1 receptor interacting with Pfizer's small-molecule agonist compounds.   Zhong worked with research vendors to conduct preclinical bioanalysis associated with the GLP-1 program.

39.     Zhong and Qiu could have continued to build on this important, life-saving work at Pfizer for years to come, but they made a different choice:  to take Pfizer's trade secrets and confidential information unlawfully to launch a competing company.  Pfizer's investigation of Defendants' conduct—which included forensic analysis of various Pfizer repositories, including Zhong's and Qiu's company-issued laptops and work email accounts—revealed that Defendants used many devices and accounts to carry out their scheme.

40.     In or around late 2017, while they were working on Pfizer's GLP-1 program, Zhong and Qiu schemed to start a business venture that would compete with Pfizer.  Around this time, Qiu and Zhong had each begun to indicate to their respective colleagues that they were dissatisfied at Pfizer.   To take one example, Qiu grumbled that he saw no suitable opportunities for advancement within the company.  Similarly, as a result of a reorganization of his group, Zhong was removed from the group's leadership team, about which he complained within Pfizer.

41.     On January 10, 2018, Zhong and Qiu ostensibly met for the purpose of "Solving Mid-age Crisis," at least according to the calendar entry for their meeting.  On information and

belief, Zhong and Qiu actually met to discuss their plan to unlawfully take and use Pfizer's trade secrets.

42.    In late January and early February 2018, while still employed by Pfizer, Qiu traveled to Beijing, China, to meet with representatives of Qilu to discuss Zhong and Qiu's contemplated business venture.  Before the trip, Qiu created a PowerPoint presentation titled "QL [Qilu] visit topics of interest," which included "QL's key drivers," where Defendants' new company would be registered, "[p]otential for IPO," and whether Defendants' new company could "use QL's Boston site," i.e., the Qilu Boston Innovator Center that opened in 2017.  The answer turned out to be yes:  Regor's Boston headquarters were located in the Qilu Boston Innovator Center until sometime in 2021.

43.    On February 7, 2018, after his return from Beijing, Qiu met with Zhong at Pfizer's Groton facility, likely to discuss Qiu's trip to Beijing—including his attempt to secure financial backing from Qilu for the new venture.  Again, they described the meeting on their calendars in generic terms as "touch base," though Qiu and Zhong did not work together on the same aspects of the GLP-1 or any other Pfizer program.

44.    As part of Pfizer's regular training and reaffirmation of its security-and-conflicts protocols, on or about February 14, 2018, Zhong and Qiu each separately affirmed that they "received, read, understand, and agree to abide by" their obligation to avoid conflicts of interest at Pfizer, including the conflict of interest that could be created by joining or establishing a start-up company.  Zhong and Qiu also affirmed that they "received, read, understand, and agree to abide by" Pfizer's information-security policies, including the prohibition against diverting Pfizer confidential information to personal email accounts and devices.  Zhong and Qiu had each previously made similar affirmations annually.

45.     Just twelve days after affirming these long-standing Pfizer policies, on February 26, 2018, Zhong sent from his Pfizer email account to his personal email account a Chinese-language summary of "minutes on the establishment of Shanghai R&D project company."  A translation of the minutes reflects the negotiations about the parameters of the joint venture between Qilu and a "founding team" that included Zhong, Qiu, and the two other Regor founders. The subject line of Zhong's email, ironically enough, was "Loyalty."

46.     Defendants' misappropriation of Pfizer's trade secrets and confidential information reached beyond Pfizer's GLP-1 program.  On February 27, 2018, Zhong sent from his Pfizer email account to his personal email account a Pfizer PowerPoint presentation titled "Bosutinib MKT Res [market research]."  This Pfizer-branded presentation included proprietary information about Pfizer's chronic myeloid leukemia ("CML") medication Bosulif (bosutinib)—including trial results and an analysis of Bosulif's strengths, weaknesses, opportunities, and risks—and also Pfizer's internal views of competing oncology medications.  Zhong had no legitimate reason to access this confidential market research information—his duties at Pfizer related to preclinical bioanalysis, not marketing.  Instead, the only plausible reason that Zhong wanted this information was because Defendants' new venture planned to pursue its own competing oncology medication, and Pfizer's trade secrets, confidential information, and strategic views relating to the market for such a medication would be invaluable to that goal.  Zhong had even left himself a reminder on a to-do list related to Zhong and Qiu's contemplated venture that included the item "CML butosinib due diligence.  Market potential, market competition."  Zhong's reference to "butosinib" was a misspelling of Bosulif's molecule name, bosutinib.

47.     On March 6, 2018, Qiu created a draft agreement between "Qilu Pharmaceutical Group" and Qiu's "Ph.D. Team" related to Defendants' new venture.  Under this draft agreement,

Qilu Pharmaceutical Co. Ltd. would provide funding for the research-and-development ("R&D") venture in exchange for a share of its profits.  The draft noted that the company would begin by developing small-molecule projects.  As explained above, Pfizer's GLP-1 receptor agonist project, with which both Zhong and Qiu were still involved at that time, is a small-molecule project.

48.     Between March 12 and May 21, 2018, Qiu and Zhong created and commented on several subsequent draft agreements.  Certain details varied between the drafts, such as the name of the joint-venture entity, which Qilu entity would provide the start-up capital, and whether Defendant Regor or its individual founders (including Zhong and Qiu) would be Qilu's co-venturers.  The basic structure and purpose of the joint venture, however, remained consistent across the drafts.  Qiu, Zhong, and the other Regor founders would operate the venture, while Qilu would provide capital in exchange for a share of the venture's profits.  Zhong typically emailed the drafts to his personal account or uploaded them to an external cloud-storage service to allow him to access them from his personal computer, then attempted to delete the drafts from his Pfizer computer.  (Pfizer recovered the drafts from the Recycle Bin of his Pfizer computer.)

49.     On March 12, 2018, while still employed at Pfizer, Zhong contacted a Chinese research vendor with which he worked at Pfizer.  Although he corresponded with the vendor using his Pfizer email account, he also copied his personal address, which gave him access to the communications after his anticipated departure from Pfizer.  Zhong wrote that he was working on a "business proposal to develop novel drugs in China," and he asked the vendor to provide estimated costs and timelines for development work that he wanted the vendor to perform.  Zhong also wrote that he was working on an "oncology and small molecule program," and he told the vendor to "assume" that he had already identified the candidate compounds.  This outreach had nothing to do with Zhong's work at Pfizer or with Pfizer's GLP-1 small-molecule program.  No

one at Pfizer had asked Zhong to contact the Chinese vendor, nor did Zhong inform Pfizer colleagues about his outreach. Rather, this "business proposal" related to Zhong and Qiu's new venture.

50.     That same day, Zhong sent from his Pfizer email account to his personal email account a Chinese-language spreadsheet that identified his business venture's fifteen initial projects. The projects fell into five therapy areas—metabolism, oncology, immunization, pain, and rare disease—with four projects identified as ready for immediate deployment in the second half of 2018, including a world-class small-molecule metabolism project. On information and belief, this latter project referred to Zhong and Qiu's efforts to develop a competitor to Pfizer's small-molecule GLP-1 receptor agonist candidate, which Regor and QILU Regor would later seek to patent.

51.     Zhong and Qiu also took affirmative steps to cover up their misconduct. In addition to the coded terms used to conceal the purpose of their meetings, forensic analysis recovered several documents that Zhong attempted to delete from his Pfizer computer, some as far back as January 2018, relating to the creation of what would become Regor and QILU Regor. These planning documents addressed issues such as staffing needs, branding, capital investments, the potential for disagreements between the joint-venture parties, and whether the companies would have sufficient capacity to take on all of the fifteen planned projects.

52.     Zhong also attempted to cover up his theft of information concerning Pfizer's GLP-1 program by concealing it in generic documents that he created. Between April 3 and April 5, 2018, Zhong accessed a sixty-nine-page 2016 internal document relating to Pfizer's GLP-1 program, and then "cut and pasted" trade secrets and other confidential information from the Pfizer document into a new document that he called "GLP Summary." The 2016 Pfizer

document, which was marked "PFIZER CONFIDENTIAL" on every page, discussed Pfizer's small-molecule GLP-1 receptor agonist technology and its efforts to develop candidate compounds.   The document included unpublished compounds, forms and clinical data, observations, study results, and strategic insights relating to Pfizer's GLP-1 technology.   For example, it described aspects of the co-crystal structure for a Pfizer small-molecule agonist compound interacting with the GLP-1 receptor; it discussed the characteristics of Pfizer's lead candidate compound; and it discussed Pfizer's strategy for identifying, evaluating, and selecting additional candidate compounds.   Importantly, it also included chemical structures of the additional candidate compounds that were not published until long after Zhong and Qiu left Pfizer. Zhong copied the content from the 2016 Pfizer document, stripped it of the Pfizer references and "PFIZER CONFIDENTIAL" designations, and pasted it into his "GLP Summary" document.

53.     Zhong had no Pfizer-related reason to create this document—he was not involved in the creation of the 2016 Pfizer document, and his job responsibilities at Pfizer as to the GLP-1 program were limited to preclinical bioanalysis.   The only plausible reason Zhong could have created the document was to facilitate the theft of Pfizer trade secrets and confidential information contained in the 2016 document for use by his and Qiu's new venture.   Indeed, activity logs on Zhong's Pfizer-issued laptop show that he uploaded the "GLP Summary" document to his personal Box cloud-storage account on April 3, 2018.   Zhong later attempted to delete both this document and the original 2016 Pfizer file from his Pfizer computer.   Forensic analysis was able to recover both files from the computer's Recycle Bin.

54.     The information in the 2016 Pfizer document was extremely sensitive and highly enabling:  it provided a development roadmap to any would-be competitor.   The GLP-1 receptor co-crystal structure, for example, was a trade secret that Pfizer had spent millions of dollars to

develop.  A competitor in possession of that information could, among other things, design and screen for active GLP-1 receptor agonist compounds on an expedited basis.  The information regarding the characteristics of Pfizer's candidate compound and Pfizer's strategy for evaluating and selecting additional candidates would give a competitor valuable insight into nonpublic aspects of Pfizer's candidate and enable a competitor immediately to begin duplicating Pfizer's strategy to develop alternatives to Pfizer's candidate.  In short, the information contained in the 2016 Pfizer document would save a competitor many years of research-and-development efforts and at least many millions of dollars in associated expenses.

55.     On April 5, 2018, Zhong met with the Chinese research vendor in person and, later that day, met with Qiu in person, again using the generic, coded term "touch base," likely to describe their meeting about their new venture.

56.     Also on April 5, 2018, Zhong forwarded from his Pfizer email account to his personal email account an email chain with a third-party research vendor that included a ninety-page draft report containing extensive proprietary information about a mouse study involving Pfizer's CML medication Bosulif.  The report was marked "PFIZER CONFIDENTIAL" on every page.  Although Zhong was involved with this study as a Pfizer employee, including providing comments on the draft to its authors, he had no legitimate reason to divert the report to his personal email account.  And given that he had previously diverted to his personal email account marketing information about Bosulif that he had no legitimate reason to have at all, it appears he diverted the Bosulif mouse study to the same email account to provide Defendants an unlawful head start in developing a competing CML medication.

57.     On information and belief, between April 12 and 15, 2018, Zhong traveled to Shanghai for meetings with top Qilu executives, including its Chairman, President, Chief Financial

Officer, and Director, which he later summarized in a document titled "QL visit note."  During those meetings, Zhong discussed details of the business venture with its potential investor, including the availability of office space at the Qilu Boston Innovator Center and the desire to begin recruiting employees immediately.  Zhong also drafted a proposed agenda for another "Ftf [face-to-face] meeting" on Sunday, April 15, 2018, which included R&D strategy, an "optimized org chart," and a budget plan for 2018 and 2019.  On information and belief, Zhong also toured several available office spaces in Shanghai for use by the new venture, and he sent to his personal email account floor plans, pricing, and photographs of various office spaces taken on April 15, 2018.  The address of one potential office space considered by Zhong is now the address of QILU Regor in Shanghai.

58.     Also on April 15, 2018, Zhong created a "To do" list that included searching for "top HR/Finance/PDM/Safety candidates" for Zhong and Qiu's new venture and gathering "[i]ntel for programs and market research for the top four programs."  The latter entry referred to the four projects that the venture had decided to pursue initially, including QILU Regor's copycat GLP-1 project.  The to-do list also noted that Zhong would "[s]ave and organize all of [his] files."  Zhong's Pfizer files were already saved on Pfizer's systems—Zhong's note thus appears to indicate his intention to save the files to his personal devices and accounts, so that he could access them after leaving Pfizer.  Zhong did not inform Pfizer management of his efforts to launch a competing business.

59.     According to the records of the Delaware Secretary of State, on May 4, 2018, a certificate of incorporation for Regor was filed listing Qiu and Zhong as directors of the company. At this time, Qiu and Zhong both still worked for Pfizer.  In a February 2021 press release, Regor continued to maintain that it was founded in July 2018, in an apparent attempt to conceal that Qiu

and Zhong founded the company before leaving Pfizer.  Qiu and Zhong's efforts to conceal their misconduct hampered Pfizer's ability to discover their scheme and mitigate the harm caused to Pfizer.

60.     According to the same Regor press release, the company was established with an initial Series A investment from Qilu.  On information and belief, Qilu was willing to make the Series A investment because the Pfizer trade secrets and confidential information that Qiu and Zhong had stolen gave their venture an unlawful head start in identifying early product candidates.

61.     On May 23, 2018, Zhong drafted an agenda for Regor's "first face to face meeting." The agenda noted that Regor's proposed criteria for selecting its projects would prioritize those with "[m]axim[um] social impact (PR)," and that it would "[f]ocus on quick wins."  Defendants' copycat version of Pfizer's small-molecule GLP-1 receptor agonist compound met both criteria.

62.     Between May 23 and 28, 2018, Zhong traveled to Shanghai.  Zhong claimed to at least one person at Pfizer that the trip was for a family wedding.  However, on information and belief, the trip was at least partially in furtherance of his and Qiu's Regor business venture.  On May 29, 2018, the day after Zhong returned to Connecticut, he informed Pfizer that he would be resigning from the company the following month.

63.     On May 30, 2018, Zhong received from a Pfizer colleague in the ordinary course of business a PowerPoint presentation that the colleague had created about Pfizer's R&D efforts in China, based on her recent visit to Pfizer's Shanghai offices.  The presentation, titled "Drug Development in China," addressed such topics as how Pfizer's Chinese office fit into the company's global operations; regulatory submissions to Chinese authorities; the feasibility of conducting future studies in China; and recent changes in Chinese regulations concerning pharmaceutical R&D.

64.     On June 4, 2018, roughly one week before he left Pfizer, Zhong forwarded this "Drug Development in China" slide deck from his Pfizer email account to his personal email account.  Zhong had no Pfizer-related reason to exfiltrate this document to his personal account.  Instead, the presentation provided insights into conducting R&D in China that would help to kickstart his and Qiu's new venture.

65.     That same day, June 4, 2018—between 6:20 p.m. and 6:27 p.m.—Zhong deleted many documents from his Pfizer laptop.  Within a span of two minutes, he deleted eighteen documents related to Zhong and Qiu's new Regor/QILU Regor business venture.  He also deleted a chart reflecting the status of *more than sixty* drug development projects across Pfizer's entire portfolio, including sensitive information about the challenges Pfizer was working to address on the projects.  The status of Pfizer's GLP-1 program was included in the chart.  He also deleted four versions of a spreadsheet reflecting the status of various Pfizer clinical and toxicological studies, including studies related to the GLP-1 program.  All of this information would be invaluable to a competitor.

66.     On June 5, 2018, Zhong created a PowerPoint document entitled "Market Research MZ" that includes proprietary Pfizer information concerning several products, including not only the market for GLP-1 receptor agonists, but also competitive intelligence relating to Pfizer's Ibrance and Bosulif, and the broader market for competing oncology medications.  As with the "GLP Summary" presentation, Zhong appears to have created this "Market Research MZ" document by copying and pasting information from confidential Pfizer documents and removing any Pfizer logos or similar identifying information in order to conceal the theft of this information from Pfizer.

67.     On June 7, 2018, Zhong again deleted a number of documents that might have revealed Defendants' scheme, again after the close of business (7:34 p.m. to 7:43 p.m.).  In a one-minute span, he deleted another five documents related to the Regor/QILU Regor business venture. He also deleted a document that he had previously created by compiling information about various Pfizer toxicological studies, including those related to the GLP-1 program.  Before he deleted this document, Zhong added information to it explaining Pfizer's convention for naming its studies—which Zhong already knew as a Director in the PDM group, but which would be useful to someone outside of Pfizer.  One minute after that, Zhong deleted a report reflecting Pfizer's internal protocol for executing toxicological studies and creating resulting reports related to the GLP-1 program. Six minutes after that, Zhong deleted a slide presentation marked "Pfizer Confidential" reflecting the status of Pfizer's Worldwide R&D portfolio, including the GLP-1 program.  Zhong had no legitimate reason to have this slide presentation—his involvement with the GLP-1 program was limited to preclinical bioanalysis.

68.     During the period between June 4 and 10, 2018, Zhong downloaded at least sixteen documents from his Pfizer computer to an external hard drive that Zhong used for his own benefit, which allowed him to retain the documents after he returned his computer to Pfizer upon his resignation days later.  Some of the documents contained extremely sensitive Pfizer trade secrets and confidential information.  For instance, Zhong downloaded to his hard drive a PowerPoint presentation that included key details about Pfizer's GLP-1 candidate, including its method of interaction with the GLP-1 receptor.  This presentation was Pfizer-branded and included "PFIZER CONFIDENTIAL" designations throughout.  This document alone provided Defendants with invaluable trade secrets, which enabled them to piggyback off Pfizer's efforts in creating their own competing compound.

69.     On June 9 and 10, 2018, just days before his resignation, Zhong saved to the external hard drive two drafts of the "Market Research MZ" document that he had initially created from confidential Pfizer documents just days earlier.  Zhong had no Pfizer-related reason to have this information in his personal possession.  Rather, he simply created this document using Pfizer trade secrets and confidential information and downloaded it to his hard drive for the future benefit of the Regor/QILU Regor business venture.

70.     Pfizer's forensic efforts were not able to recover all of the documents that Zhong downloaded to the external hard drive between June 4 and 10, 2018.  However, forensic analysis was able to recover the documents' file names and other metadata, which indicate that Zhong's theft of Pfizer information was not limited to the GLP-1 program.  For instance, the file names indicate that Zhong downloaded Pfizer documents related to other therapy areas such as CML and breast cancer during this same time period.

71.     After downloading the documents to the hard drive, Zhong deleted the copies that were on his Pfizer computer in an attempt to hide his illegal conduct.

72.     Shortly before Zhong's departure, he had an exit interview, as is customary when a Pfizer colleague is leaving the company.  At the time of his exit interview, Zhong turned in his Pfizer laptop, Pfizer-issued iPhone, and Pfizer badge.

73.     During the course of Pfizer's investigation into Qiu's and Zhong's misconduct, Pfizer learned for the first time that the iPhone Zhong turned in at his exit interview was not his. Instead, it had belonged to one of Zhong's reports who had left Pfizer three months earlier and turned in his phone to Zhong at the time.  Unbeknownst to Pfizer when Zhong departed, Zhong had contacted that former Pfizer colleague on June 7, 2019, to ask him for the iPhone's PIN

number, falsely claiming that Pfizer's IT department had requested it.  The former colleague provided his PIN number to Zhong.

74.    The activity logs on the former colleague's iPhone reveal that over the next two days, Zhong accessed the former colleague's device and connected it to a Wi-Fi access point that corresponds to Zhong's home address in Connecticut.  Zhong later wiped all data from the former colleague's iPhone and returned it to its factory settings before he turned it in at his exit interview. Zhong never told Pfizer that the phone he turned in was not his.  Zhong's real Pfizer-issued iPhone has never been recovered, and Pfizer has not had an opportunity to inspect it to identify additional materials stolen from Pfizer.

75.    On June 12, 2018, Zhong and Qiu departed Pfizer and their employment ended. Each of them declined to tell management anything specific about their professional plans.

## IV.    Defendants File Patent Applications Relying on Pfizer Trade Secrets

76.    On June 21, 2018, shortly after Zhong and Qiu departed Pfizer, Pfizer's first GLP-1 patent application published.  Although this patent application includes the chemical structure for the candidate compound now known as danuglipron, it includes the chemical structures of over 250 other small-molecule compounds that Pfizer discovered to be active during the course of the research-and-development project spanning several years.

77.    On November 22, 2018, just five months after Pfizer's GLP-1 small-molecule patent application published, Qiu and Zhong's new venture, Regor, filed a patent application (Patent Application No. PCT/CN2018/117047, the '047 patent application) describing a set of small-molecule GLP-1 receptor agonist compounds that appear strikingly similar to the small-molecule GLP-1 receptor agonist compounds that Pfizer had developed, including one of the compounds that Pfizer had internally selected as its clinical candidate.  It took Pfizer many years of work, at a cost of hundreds of millions of dollars, to discover and develop active small-molecule

GLP-1 receptor agonist compounds and to test and refine that set of compounds until it had identified and selected viable candidate compounds with desirable properties.  Without Pfizer's trade secrets and confidential information resulting from Pfizer's long-term efforts, it would have been impossible for a brand-new start-up company with no track record in research and development to make, test, and identify multiple active GLP-1 receptor agonist compounds in time to attempt to patent that work only five months after that company was created.  Indeed, Regor— which in July 2018 only had four employees—did not even have office space until soon before Zhong's and Qiu's Pfizer departures.

78.     The only plausible explanation for why Regor was able to file a patent application so quickly after its founding is because Zhong and Qiu used the trade secrets and confidential information they stole from Pfizer on their way out the door.  Regor's '047 patent application has an unmistakable hallmark of theft from Pfizer:  the application includes a compound that is *identical* to a promising compound that Pfizer had developed internally, but that *was not included* in Pfizer's published patent application at that time.

79.     On November 19, 2019, Qiu and Zhong's other new venture, QILU Regor, filed an International Patent Application, which published as WO2020/103815 ('815 patent application) claiming priority to the '047 patent application, and adding 142 more example small-molecule compounds.  The publication of the '815 patent application on May 28, 2020 alerted Pfizer for the first time to the possibility that Zhong and Qiu had misappropriated Pfizer's trade secrets and confidential information when they departed Pfizer in June 2018.

80.     The '815 application included an experiment that used Pfizer's candidate compound (which QILU Regor called "control 418") as a control.  QILU Regor relied on the results of this experiment, a pharmacokinetic ("pk") study conducted in monkeys, to distinguish

the control compound.  This is striking because it is typical to rely on other types of animals for pk studies, particularly early in development—for instance, the FDA's website recommends using rats, mice, and dogs.  Monkey pk studies are generally not used until much further in the process. QILU Regor's abrupt jump from *in vitro* testing to a monkey pk study is far from typical.  It is yet another indication that Defendants had inside information on the characteristics of Pfizer's small-molecule GLP-1 receptor compounds, and specifically, the characteristics of Pfizer's candidate, and that QILU Regor relied on Pfizer's trade secrets to develop the work in its patent application.

81.     QILU Regor also filed a different patent application directed at small-molecule GLP-1 receptor agonist compounds similar to Pfizer's danuglipron.  On April 12, 2019, QILU Regor filed a patent application assigned the number PCT/CN2019/082381 ('381 patent application) that describes over 100 example small-molecule GLP-1 receptor agonist compounds resembling Pfizer's.   When QILU Regor filed the International Patent Application, which published as WO2020/207474 ('474 patent application) claiming priority to the '381 patent application, QILU Regor added 232 more example compounds.  The contents of the '474 patent application did not become public until October 15, 2020.  QILU Regor's decision to file and prosecute a second family of patents that cover small-molecule GLP-1 receptor agonists is further confirmation that QILU Regor intends to compete with Pfizer in the small-molecule GLP-1 receptor agonist market.

82.     On May 27, 2020, QILU Regor filed another GLP-1 receptor agonist small-molecule compound-related patent application (application number PCT/CN2020/092530), from which they claimed priority in the International Patent Application, which published as WO2021/242817 ('817 patent application).  The '817 patent application, which is directed at salts and crystal forms of two specific GLP-1 receptor agonist compounds, was filed one day prior to

the publication of QILU Regor's first patent application that includes these two specific compounds (the '815 patent application). The only salt forms exemplified in the '817 patent application are the tris and citrate salts. Notably, the citrate salt form was not included in Pfizer's first GLP-1 patent application but was included in the confidential information Zhong pasted into the "GLP summary" document and then uploaded to his Box account. The '817 patent application further demonstrates that Zhong and Qiu did not act independently but were relying on Pfizer's trade secrets and confidential information.

83. On May 5, 2019, QILU Regor began filing yet another family of patent applications. This family, which was not made public until November 12, 2020, describes Cyclin-Dependent Kinase ("CDK") inhibitors and their use to treat various types of cancer, including CML and breast cancer. Pfizer's Ibrance, which was the subject of several market-research documents that Defendants stole, is a CDK inhibitor. If QILU Regor brings a CDK inhibitor to market, it will compete with Ibrance and, less directly, Bosulif, which was the subject of other internal Pfizer documents that Defendants also stole as they left Pfizer.

84. Armed with Pfizer's trade secrets and confidential information, Regor already has had financial success. For example, in February 2021, Regor announced that it had successfully completed a $90 million Series B financing. Moreover, Eli Lilly and Regor recently announced a strategic collaboration to develop drugs for metabolic disorders which includes a license to Regor's small molecule GLP-1R agonist patents. Of note, Regor will receive an upfront payment of up to $50 million from Eli Lilly, and is eligible to receive up to $1.5 billion in potential payments based on certain milestones and royalties.

## COUNT ONE
## Misappropriation of Trade Secrets Under the DTSA (All Defendants)

85.     Pfizer repeats and realleges each and every allegation set forth above as if fully set forth herein.

86.     This is a claim for violation of the DTSA, 18 U.S.C § 1836, *et seq.*, for the misappropriation of Pfizer's confidential, proprietary, and trade-secret information.

87.     Pfizer owns the confidential, proprietary, and trade-secret information misappropriated by Defendants, and those trade secrets are related to products used in, or intended for use in, interstate and/or foreign commerce.  Furthermore, the confidential, proprietary, and trade-secret information misappropriated by Defendants discloses highly sensitive information regarding Pfizer's GLP-1 candidate compounds, including how those compounds interact with the GLP-1 receptor; the GLP-1 compounds that did not meet the stringent requirements for advancing to clinical testing; the methods by which Pfizer developed and selected its GLP-1 candidate compounds, including clinical and toxicological studies and 3D modeling of the GLP-1 receptor; unpublished compounds; forms and clinical data; and market research related to GLP-1 compounds and Pfizer oncology medications, including internal assessments about the strengths and weaknesses of those medications as compared to the competition.

88.     Zhong and Qiu, by and through the employment agreements signed pursuant thereto, are subject to continuing confidentiality restrictions and have a duty to maintain confidentiality and not to use for any of their own purposes, or others' purposes, the confidential, proprietary, and trade-secret information to which they had access pursuant to their employment with Pfizer.  These confidentiality obligations were reiterated in Pfizer policies and employee handbook, and Zhong and Qiu received periodic training about the need to safeguard the confidentiality of Pfizer information.

89.     In addition to ensuring that its employees would safeguard the information's confidentiality, Pfizer took other reasonable steps to maintain that confidentiality, including restricting employees' access to the information, storing certain information in password-protected databases, tracking employees' access of those databases, and marking certain documents containing trade secrets or confidential information as "PFIZER CONFIDENTIAL."

90.     Zhong and Qiu knowingly and intentionally acquired, disclosed and/or used Pfizer's confidential, proprietary, and trade-secret information, including information about Pfizer's small-molecule GLP-1 receptor agonist candidates and oncology medications, among other products and/or services intended for use in interstate and/or foreign commerce, without the consent of Pfizer and by improper means, including conduct in breach of their employment agreements.  Zhong and Qiu acted for their own benefit and for the benefit of the other Defendants. The types of documents that Zhong and Qiu took are documents that Pfizer carefully protected and that any reasonable business in the industry would carefully protect from disclosure to a competitor.  These trade secrets derived independent economic value from not being generally known to, and not readily ascertainable through proper means by, a competitor.

91.     A forensics review of Zhong's and Qiu's digital activities determined that Zhong and Qiu coordinated to copy trade secrets and confidential information from Pfizer documents into new documents stripped of the references to Pfizer; download materials containing Pfizer trade secrets and confidential information to an encrypted hard drive; email Pfizer trade secrets and confidential information to personal email accounts; and cover their tracks by using code names for their meetings as well as deleting evidence from company devices.

92.     Zhong and Qiu were or should have been aware at the time they copied, downloaded, emailed, and/or retained Pfizer's documents that those documents contained Pfizer's

trade secrets and confidential information.  Qiu held a position on the Steering Committee that oversaw the development of a high-resolution structure of the GLP-1 receptor interacting with Pfizer's small-molecule agonist compounds, due to which he had access to a significant amount of Pfizer's confidential, proprietary, and trade-secret information.  Zhong and Qiu took Pfizer's confidential, proprietary, and trade-secret information and transferred Pfizer's documents onto personal accounts and devices for no business purpose, and in violation of their employment agreements.

93.     Having taken Pfizer's documents, Defendants used and/or disclosed Pfizer's confidential, proprietary, and trade-secret information by incorporating it into Defendants' patent application for a potential oral diabetes medication that discloses information that Pfizer had not made public.  Defendants continue to use and/or disclose Pfizer's confidential, proprietary, and trade-secret information by filing additional patent applications and developing drug candidates and potentially competing products that rely on that information.

94.     The wrongful acquisition, disclosure, and/or use of Pfizer's confidential, proprietary, and trade-secret information gives Defendants an unfair benefit and wrongful advantage in the marketplace over Pfizer, the rightful owner of Pfizer's confidential, proprietary, and trade-secret information.

95.     As a result of the aforementioned conduct, Zhong and Qiu have wrongfully misappropriated Pfizer's confidential, proprietary, and trade-secret information and threaten to continue using and/or disclosing it to their benefit and to the detriment of Pfizer.

96.     The aforementioned actions by Defendants in wrongfully misappropriating Pfizer's confidential, proprietary, and trade-secret information were intentional, knowing, willful,

malicious, fraudulent, and oppressive.  The actions of Defendants, as set forth herein, constitute

actual and threatened misappropriation under the DTSA, 18 U.S.C. § 1836, *et seq.*

97.    As a direct and proximate result of Defendants' actions, Pfizer has been greatly

damaged, has suffered irreparable harm, and will continue to suffer irreparable harm.   If

Defendants were to disclose Pfizer's trade secrets publicly, or if they were able to reach the market

with competing products that rely on Pfizer's trade secrets, Pfizer would suffer irreparable harm

for which it would have no adequate remedy at law.

98.    In addition to causing Pfizer actual damages, Defendants were unjustly enriched by

their misappropriation of Pfizer's valuable trade secrets and confidential information.   Among

other things, the misappropriation afforded Defendants valuable patent rights and allowed

Defendants to avoid substantial research-and-development costs that they otherwise would have

had to incur in pursuing a viable GLP-1 candidate compound, both by showing Defendants what

worked for Pfizer and, just as importantly, what did not.   The misappropriation enabled Defendants

to identify a GLP-1 candidate compound that could be presented as a potential competitor to

Pfizer's, attract tens of millions of dollars in investment for their venture, and license the ill-gotten

intellectual property to others, and to do so in a significantly shorter amount of time than would

otherwise be required.   Even if Defendants would have been able to identify a competing

compound without Pfizer's trade secrets, their misappropriation gave them a significant head start

in reaching the market.  Defendants' misappropriation of Pfizer market research also enabled them

to determine which products they could develop most profitably, including a CDK inhibitor that

will, if approved for marketing, compete with Pfizer's Ibrance.

## COUNT TWO
## Misappropriation of Trade Secrets Under the CUTSA (All Defendants)

99.     Pfizer repeats and realleges each and every allegation set forth above as if fully set forth herein.

100.    This is a claim for violation of the CUTSA, Conn. Gen. Stat. § 35-50, *et seq.*, for the misappropriation of Pfizer's confidential, proprietary, and trade-secret information.

101.    Pfizer owns the confidential, proprietary, and trade-secret information misappropriated by Defendants.  Furthermore, the confidential, proprietary, and trade-secret information misappropriated by Defendants discloses highly sensitive information regarding Pfizer's GLP-1 candidate compounds, including how those compounds interact with the GLP-1 receptor; the GLP-1 compounds that did not meet the stringent requirements for advancing to clinical testing; the methods by which Pfizer developed and selected its GLP-1 candidate compounds, including clinical and toxicological studies and 3D modeling of the GLP-1 receptor; unpublished compounds; forms and clinical data; and market research related to GLP-1 compounds and Pfizer oncology medications, including internal assessments about the strengths and weaknesses of those medications as compared to the competition.

102.    Zhong and Qiu, by and through the employment agreements signed pursuant thereto, are subject to continuing confidentiality restrictions and have a duty to maintain confidentiality and not to use for any of their own purposes, or others' purposes, the confidential, proprietary, and trade-secret information to which they had access pursuant to their employment with Pfizer.  These confidentiality obligations were reiterated in Pfizer policies and employee handbook, and Zhong and Qiu received periodic training about the need to safeguard the confidentiality of Pfizer information.

103.    In addition to ensuring that its employees would safeguard the information's confidentiality, Pfizer took other reasonable steps to maintain that confidentiality, including restricting employees' access to the information, storing certain information in password-protected databases, tracking employees' access of those databases, and marking certain documents containing trade secrets or confidential information as "PFIZER CONFIDENTIAL."

104.    Zhong and Qiu knowingly and intentionally acquired, disclosed, and/or used Pfizer's confidential, proprietary, and trade-secret information, including information about Pfizer's small-molecule GLP-1 receptor agonist candidates and oncology medications, among other products and/or services, without the consent of Pfizer and by improper means, including conduct in breach of their employment agreements.  Zhong and Qiu acted for their own benefit and the benefit of the other Defendants.  The types of documents that Zhong and Qiu took are documents that Pfizer carefully protected and that any reasonable business in the industry would carefully protect from disclosure to a competitor.  These trade secrets derived independent economic value from not being generally known to, and not readily ascertainable through proper means by, a competitor.

105.    A forensics review of Zhong and Qiu's digital activities determined that Zhong and Qiu coordinated to copy trade secrets and confidential information from Pfizer documents into new documents stripped of the references to Pfizer; download materials containing Pfizer trade secrets and confidential information to an encrypted hard drive; email Pfizer trade secrets and confidential information to personal email accounts; and cover their tracks by using code names for their meetings as well as deleting evidence from company devices.

106.    Zhong and Qiu were or should have been aware at the time they copied, downloaded, emailed, and/or retained Pfizer's documents that those documents contained Pfizer's

trade secrets and confidential information.  Qiu held a position on the Steering Committee that oversaw the development of a high-resolution structure of the GLP-1 receptor interacting with Pfizer's small-molecule agonist compounds, due to which he had access to a significant amount of Pfizer's confidential, proprietary, and trade-secret information.  Zhong and Qiu took Pfizer's confidential, proprietary, and trade-secret information and transferred Pfizer's documents onto personal accounts and devices for no business purpose, and in violation of their employment agreements.

107.    Having taken Pfizer's documents, Defendants used and/or disclosed Pfizer's confidential, proprietary, and trade-secret information by incorporating it into Defendants' patent application for a potential oral diabetes medication that discloses information that Pfizer had not made public.  Defendants continue to use and/or disclose Pfizer's confidential, proprietary, and trade-secret information by filing additional patent applications and developing drug candidates and potentially competing products that rely on that information.

108.    The wrongful acquisition, disclosure, and/or use of Pfizer's confidential, proprietary, and trade-secret information gives Defendants an unfair benefit and wrongful advantage in the marketplace over Pfizer, the rightful owner of Pfizer's confidential, proprietary, and trade-secret information.

109.    As a result of the aforementioned conduct, Zhong and Qiu have wrongfully misappropriated Pfizer's confidential, proprietary, and trade-secret information and threaten to continue using and/or disclosing it to their benefit and to the detriment of Pfizer.

110.    The aforementioned actions by Defendants in wrongfully misappropriating Pfizer's confidential, proprietary, and trade-secret information were intentional, knowing, willful,

malicious, fraudulent, and oppressive.  The actions of Defendants, as set forth herein, constitute actual and threatened misappropriation under the CUTSA, Conn. Gen. Stat. § 35-50, *et seq.*

111.    As a direct and proximate result of Defendants' actions, Pfizer has been greatly damaged, has suffered irreparable harm, and will continue to suffer irreparable harm.   If Defendants were to disclose Pfizer's trade secrets publicly, or if they were able to reach the market with competing products that rely on Pfizer's trade secrets, Pfizer would suffer irreparable harm for which it would have no adequate remedy at law.

112.    In addition to causing Pfizer actual damages, Defendants were unjustly enriched by their misappropriation of Pfizer's valuable trade secrets and confidential information.   Among other things, the misappropriation afforded Defendants valuable patent rights and allowed Defendants to avoid substantial research-and-development costs that they would have otherwise had to incur in pursuing a viable GLP-1 candidate compound, both by showing Defendants what worked for Pfizer and, just as importantly, what did not.  The misappropriation enabled Defendants to identify a GLP-1 candidate compound that could be presented as a potential competitor to Pfizer's, attract tens of millions of dollars in investment for their venture, and license the ill-gotten intellectual property to others, and to do so in a significantly shorter amount of time than would otherwise be required.   Even if Defendants would have been able to identify a competing compound without Pfizer's trade secrets, their misappropriation gave them a significant head start in reaching the market.  Defendants' misappropriation of Pfizer market research also enabled them to determine which products they could develop most profitably, including a CDK inhibitor that will, if approved for marketing, compete with Pfizer's Ibrance.

## COUNT THREE
## Breach of Contract Under New York Law (Qiu)

113.    Pfizer repeats and realleges each and every allegation set forth above as if fully set forth herein.

114.    Qiu knowingly and for valuable consideration, including his Pfizer employment and the corresponding salary and benefits, entered into the Employment Agreement with Pfizer.

115.    The Employment Agreement expressly:  (a) precludes Qiu from "disclos[ing] or us[ing]" any "secret or confidential information" without the company's written permission, other than in the course of his employment; (b) provides that "the entire right, title and interest in and to" "any idea, discovery, invention, improvement, software, writing or other material or design conceived, made or developed by" Qiu "solely or jointly with others during the period of" his employment with the company, "whether patentable or not that relates in any manner to the actual or anticipated business operations, work, investigations or research of" the company, "shall belong to the Company"; (c) requires that, at the company's request, Qiu "will assign to the Company any application for letters patent or of trademark registration made thereon, and to any common-law or statutory copyright therein"; (d) precludes Qiu, during the term of his employment, from "engag[ing] in any activity in competition with or against the best interests of the Company" or being "employed by or participat[ing] in the ownership, management or control, or otherwise be[ing] affiliated [with] . . . any other business entity, or engage in any business which in any manner competes with the business" of the company without prior written consent; and (e) requires Qiu to "return within 48 hours" of his termination "all Company materials within [his] possession, whether confidential or proprietary or that in any way relates to the business of the Company or any of its subsidiaries or affiliates."

116.    The terms of the Employment Agreement are reasonable in scope and duration, and are necessary to protect Pfizer's interest in its confidential, proprietary, and trade-secret information, as well as other legitimate business interests.

117.    The Employment Agreement is a lawful contract governed by New York law, voluntarily and knowingly entered into by Qiu.

118.    During the course of his employment, Qiu was able to obtain confidential, proprietary, and trade-secret information from Pfizer, which was covered by the terms of the Employment Agreement.

119.    Pfizer has performed all of its contractual obligations owed to Qiu under the terms of the Employment Agreement.

120.    Qiu has unjustifiably and inexcusably breached, and continues to breach, the Employment Agreement by, inter alia:   (i) using and/or disclosing Pfizer's confidential, proprietary, and trade-secret information without Pfizer's written permission and for unauthorized purposes; (ii) failing to assign to Pfizer his entire rights, title, and interest in any patents or patent applications covering inventions that he conceived, made, and/or developed while employed at Pfizer, including Defendants' patents relating to small-molecule GLP-1 receptor agonist compounds; (iii) cofounding and working for the benefit of Pfizer's competitors Regor and QILU Regor while employed by Pfizer and without Pfizer's written consent; and (iv) failing to return all materials belonging to Pfizer upon the conclusion of his employment with Pfizer.

121.    Qiu acknowledged in his signed Employment Agreement that "any breach by me of this Agreement would cause irreparable harm to the Company and that in the event of such breach, the Company shall have . . . the right to an injunction, specific performance and other equitable relief to prevent violations of my obligations hereunder."

122.   As a result of these breaches, Pfizer suffered actual damages and is entitled to equitable relief, including an injunction and specific performance of Qiu's obligation to assign to Pfizer his entire rights, title, and interest in any patents or patent applications covering inventions that he conceived, made, and/or developed while employed at Pfizer, as well as Qiu's obligation to return all materials belonging to Pfizer upon the conclusion of his employment with Pfizer.

## COUNT FOUR
### Breach of Contract Under Connecticut Law (Zhong)

123.   Pfizer repeats and realleges each and every allegation set forth above as if fully set forth herein.

124.   Zhong knowingly and for valuable consideration, including his Pharmacia employment and the corresponding salary and benefits, entered into the Patent, Trade Secrets, and Copyright Agreement with Pharmacia (which was acquired by Pfizer in 2003).

125.   The Patent, Trade Secrets, and Copyright Agreement expressly:  (a) restricts Zhong from "us[ing] or disclos[ing]" any of the company's "inventions, improvements, confidential information and trade secrets" during or after his employment without the company's written consent; (b) provides that "any confidential information, trade secrets, improvements and inventions conceived or reduced to practice" by Zhong, "either alone or with others" while employed by the company, so far as they "relate to the business, processes, apparatus, products, researches or research programs" of the company, "shall be regarded as made and held by" Zhong in "a fiduciary capacity solely for the benefit of" the company, "shall not be disclosed to others without [the Company's] written consent, and shall be the sole and exclusive property of" the company; and (c) requires that Zhong, "when requested so to do, either during or after said employment, shall assign to" the company his "entire right and title to said improvements and

inventions and any U.S. and foreign patent applications and patents covering the same, and assist" the company in "obtaining, defending and enforcing any such right and title."

126.    The Patent, Trade Secrets, and Copyright Agreement also provides that the obligations set forth in the agreement are "[i]n consideration of the employment or continuation of employment of the Employee by [Pharmacia] or an affiliated company (affiliated company shall mean any corporation, firm, partnership or other entity which directly or indirectly controls, is controlled by, or is under common control with [Pharmacia])."

127.    The terms of the Patent, Trade Secrets, and Copyright Agreement are reasonable in scope and duration, and are necessary to protect Pfizer's interest in its confidential, proprietary, and trade-secret information, as well as other legitimate business interests.

128.    The Patent, Trade Secrets, and Copyright Agreement is a lawful contract governed by Connecticut law, voluntarily and knowingly entered into by Zhong.

129.    During the course of his employment, Zhong was able to obtain confidential, proprietary, and trade-secret information from Pfizer, which was covered by the terms of the Patent, Trade Secrets, and Copyright Agreement.

130.    Pfizer has performed all of its contractual obligations owed to Zhong under the terms of the Patent, Trade Secrets, and Copyright Agreement.

131.    Zhong has unjustifiably and inexcusably breached, and continues to breach, the Patent, Trade Secrets, and Copyright Agreement by, inter alia:  (i) using and/or disclosing Pfizer's confidential, proprietary, and trade-secret information without Pfizer's written permission and for unauthorized purposes; and (ii) failing to assign to Pfizer his entire right and title in any patents or patent applications covering inventions that he conceived or reduced to practice while employed

at Pfizer, including Defendants' patents relating to small-molecule GLP-1 receptor agonist compounds.

132.    As a result of these breaches, Pfizer suffered actual damages and is entitled to equitable relief, including an injunction and specific performance of Zhong's obligation to assign to Pfizer his entire rights and interest in any patents or patent applications covering inventions that he conceived or reduced to practice while employed at Pfizer.

## COUNT FIVE
### Breach of Fiduciary Duty Under Connecticut Law (Zhong and Qiu)

133.    Pfizer repeats and realleges each and every allegation set forth above as if fully set forth herein.

134.    By virtue of their positions of trust and confidence with Pfizer, Zhong's position as Director of Clinical Outsourcing for Pfizer's PDM group and Qiu's position as Executive Director for Structural Biology, their supervision of other employees as part of their Pfizer duties, and their access to confidential, proprietary, and trade-secret information relating to Pfizer's business activities and interests, Zhong and Qiu each owed Pfizer fiduciary duties, including a duty of loyalty. That duty included the obligation to work solely in Pfizer's best interests and in good faith in any matter relating to Pfizer, and to refrain from using their time, efforts, and training to compete with Pfizer.

135.    In violation of their duty to Pfizer, Zhong and Qiu did not act exclusively in Pfizer's interest in all matters of business. Zhong and Qiu breached their duty of loyalty by secretly and simultaneously working to cofound companies that would directly compete with Pfizer to develop and market innovative medicines. While employed by Pfizer and receiving significant salaries and benefits from Pfizer, Zhong and Qiu undertook activities in contravention of their duty, including meeting with potential investors for their new companies, working on draft agreements

for a joint venture between their companies and Qilu, communicating with research vendors regarding a business proposal, and filing a certificate of incorporation for Regor listing both Zhong and Qiu as directors.   As a consequence of these breaches, Zhong and Qiu forfeited their entitlement to compensation from Pfizer during the period of their disloyalty.

136.     As a result of these breaches, Pfizer suffered actual damages.

137.     Zhong and Qiu caused and continue to cause Pfizer actual immediate and irreparable harm for which Pfizer has no adequate remedy at law.

138.     Upon information and belief, Zhong and Qiu acted intentionally, willfully, maliciously, and with reckless indifference to Pfizer's rights.

139.     Executive Orders 7G and 10A, issued by the Governor of Connecticut, suspended "all statutory time requirements, statutes of limitation or other limitations or deadlines relating to service of process, court proceedings or court filings in civil matters" from March 19, 2020 to March 1, 2021.

## COUNT SIX
### Breach of the Duty of Loyalty Under Connecticut Law (Zhong and Qiu)

140.     Pfizer repeats and realleges each and every allegation set forth above as if fully set forth herein.

141.     By virtue of their positions of trust and confidence with Pfizer, Zhong's position as Director of Clinical Outsourcing for Pfizer's PDM group and Qiu's position as Executive Director for Structural Biology, their supervision of other employees as part of their Pfizer duties, and their access to confidential, proprietary, and trade-secret information relating to Pfizer's business activities and interests, Zhong and Qiu each owed Pfizer a duty of loyalty.   That duty included the obligation to work solely in Pfizer's best interests and in good faith in any matter relating to Pfizer, and to refrain from using their time, efforts, and training to compete with Pfizer.

142.     In violation of their duty to Pfizer, Zhong and Qiu did not act exclusively in Pfizer's interest in all matters of business.  Zhong and Qiu breached their duty of loyalty by secretly and simultaneously working to cofound companies that would directly compete with Pfizer to develop and market innovative medicines.  While employed by Pfizer and receiving significant salaries and benefits from Pfizer, Zhong and Qiu undertook activities in contravention of their duty, including meeting with potential investors for their new companies, working on draft agreements for a joint venture between their companies and Qilu, communicating with research vendors regarding a business proposal, and filing a certificate of incorporation for Regor listing both Zhong and Qiu as directors.  As a consequence of these breaches, Zhong and Qiu forfeited their entitlement to compensation from Pfizer during the period of their disloyalty.

143.     As a result of these breaches, Pfizer suffered actual damages.

144.     Zhong and Qiu caused and continue to cause Pfizer actual immediate and irreparable harm for which Pfizer has no adequate remedy at law.

145.     Upon information and belief, Zhong and Qiu acted intentionally, willfully, maliciously, and with reckless indifference to Pfizer's rights.

146.     Executive Orders 7G and 10A, issued by the Governor of Connecticut, suspended "all statutory time requirements, statutes of limitation or other limitations or deadlines relating to service of process, court proceedings or court filings in civil matters" from March 19, 2020 to March 1, 2021.

## COUNT SEVEN
## Unfair and Deceptive Trade Practices Under CUTPA (All Defendants)

147.     Pfizer repeats and realleges each and every allegation set forth above as if fully set forth herein.

148.    At all relevant times herein, Defendants have been engaged in the trade or commerce of developing for sale, advertising for sale, the offering for sale, and/or the sale of pharmaceutical products to consumers in the State of Connecticut, and said activities constitute the primary trade or commerce of Defendants.

149.    While employed at Pfizer and receiving significant salaries and benefits from Pfizer, Zhong and Qiu worked to cofound companies that would directly compete with Pfizer to develop and market innovative medicines.  They undertook activities including but not limited to meeting with potential investors for their new companies, working on draft agreements for a joint venture between their companies and Qilu, communicating with research vendors regarding a business proposal, and filing a certificate of incorporation for Regor listing both Zhong and Qiu as directors.  Defendants' subsequent patent filings misled investors and consumers into reasonably believing that Defendants' position in the marketplace was due to Defendants' own legitimate efforts rather than the unlawful preparation undertaken by Defendants while Zhong and Qiu were still employed by Pfizer.

150.    Defendants' illegitimate scheme to compete with Pfizer constitutes a violation of Conn. Gen. Stat. § 42-110b, or similar law, as an unfair and deceptive act or practice in the conduct of any trade or commerce.

151.    By virtue of the conduct alleged herein, Defendants have violated CUTPA in that said conduct offends public policy as it has been established by statutes and/or common law, violates established concepts of fairness, and constitutes unfair and deceptive practices and/or practices which are illegal, immoral, unethical, oppressive, and/or unscrupulous.

152.    By virtue of the conduct alleged herein, Defendants' practices are likely to mislead and affect the decisions and conduct of investors and consumers, who have interpreted and will reasonably interpret Defendants' patent filings in Defendants' favor.

153.    Defendants' violation of CUTPA has directly and proximately caused an ascertainable loss of money or property to Pfizer, which Pfizer is entitled to recover as actual damages.

154.    In addition, Defendants' conduct was willful and wanton and demonstrated a reckless indifference to the rights of Pfizer, investors, and consumers.  Consequently, Pfizer is entitled to an award of punitive and/or exemplary damages, in an amount to be determined at trial, and to recover its costs and attorneys' fees.

155.    Executive Orders 7G and 10A, issued by the Governor of Connecticut, suspended "all statutory time requirements, statutes of limitation or other limitations or deadlines relating to service of process, court proceedings or court filings in civil matters" from March 19, 2020 to March 1, 2021.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    Actual damages in an amount to be determined at trial;

B.    Injunctive relief that (1) prohibits Defendants from making any use of Pfizer's trade secrets or confidential information, (2) requires Defendants to return and/or destroy (as appropriate) all information stolen from Pfizer that remains in their possession, including any information derived from that stolen information, and (3) requires Defendants to produce to Pfizer for inspection any electronic devices, including personal computers, laptops, desktops, iPads or similar tablet devices, smartphones, other handheld devices, external hard drives, flash drives, as

well as any cloud-based or social media-based accounts, that are, or have been, in the possession, custody or control of Defendants for Pfizer to forensically review the devices and identify all Pfizer-owned material that will then be promptly removed to Pfizer and removed permanently from the devices and/or accounts;

      C.    Specific performance of the patent assignment obligations in Zhong's and Qiu's employment agreements, which require Zhong and Qiu to assign to Pfizer their entire rights, title, and/or interest in any patents or patent applications covering inventions that they conceived, made, developed, and/or reduced to practice while employed at Pfizer;

      D.    An order directing Defendants to assign to Plaintiff Patent Application Nos. PCT/CN2018/117047, WO2020/103815, PCT/CN2019/082381, WO2020/207474, PCT/CN2020/092530, WO2021/242817, and any other applications or patents that have issued or may issue based on or claiming priority to the same.

      E.    Judgment declaring at least the following:

           a.    That Defendants' purported assignment of Patent Application Nos. PCT/CN2018/117047, WO2020/103815, PCT/CN2019/082381, WO2020/207474, PCT/CN2020/092530, WO2021/242817, and any other applications or patents that may issue based on or claiming priority to the same to Regor or QILU Regor is ineffective; and

           b.    That Plaintiff is the rightful owner of Patent Application Nos. PCT/CN2018/117047, WO2020/103815, PCT/CN2019/082381, WO2020/207474, PCT/CN2020/092530, WO2021/242817, and any other applications or patents that may issue based on or claiming priority to the same;

F.      Damages and/or disgorgement for unjust enrichment caused by Defendants' misappropriation that is not addressed in computing actual damages;

G.      Exemplary damages;

H.      Punitive damages;

I.      Restitution of salary and benefits paid by Pfizer to Zhong and Qiu during their period of disloyalty;

J.      Disgorgement of any funds or other material benefits received by Zhong and Qiu from third parties as a result of their disloyalty;

K.      A reasonable royalty to Pfizer for Defendants' use of Pfizer's trade secrets and confidential information;

L.      Fees and costs, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D), Conn. Gen. Stat. §§ 35-53, 42-110g, or as otherwise permitted by law; and

M.      Such further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Pfizer requests a jury trial of all issues properly triable by jury.

Dated: February 2, 2022

Respectfully submitted,

/s/ James I. Glasser

Of Counsel:
Ashok Ramani*
Gareth E. DeWalt*
James Y. Park*
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, CA 94025
Tel:    (650) 752-2000
ashok.ramani@davispolk.com
gareth.dewalt@davispolk.com
james.park@davispolk.com

James I. Glasser (ct07221)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street, P.O. Box 1832
New Haven, CT 06508
Tel:    (203) 498-4313
jglasser@wiggin.com

*Counsel for Plaintiff Pfizer Inc.*

Dana M. Seshens*
Matthew Cormack*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel:    (212) 450-4000
dana.seshens@davispolk.com
matthew.cormack@davispolk.com

*pro hac vice* applications forthcoming