## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PFIZER, INC., | CASE NO. 3:22CV190 (JAM) |
| Plaintiff, | |
| v. | March 18, 2022 |
| REGOR THERAPEUTICS INC., QILU REGOR THERAPEUTICS INC., XIAYANG QIU, MIN ZHONG, AND DOES 1-10, | |
| Defendant. | |

## DEFENDANTS' ANSWER TO
## COMPLAINT

Defendants Regor Therapeutics Inc., Qilu Regor Therapeutics Inc., Xiayang Qiu, Min Zhong, ("Defendants" or "Regor Parties") submit this Answer and Affirmative Defenses to plaintiff Pfizer Inc.'s ("Plaintiff's" or "Pfizer's") Complaint (Dkt. 1 ("Complaint")). Except as specifically admitted below, Defendants deny Plaintiff's allegations. To the extent the opening paragraph or any of the headings or footnotes of the Complaint require a response, Defendants deny such allegations except as they are specifically admitted below.

## NATURE OF THE ACTION

1.     Denied as stated. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore deny them.

2.     Denied as stated. Defendants admit that diabetes and obesity are significant public health issues and that many Americans suffer from Type 2 diabetes or are considered pre-diabetic. Defendants otherwise deny the allegations contained in paragraph 2.

3.     Denied as stated. Defendants admit that Dr. M. Zhong and Dr. Qiu were longtime Pfizer employees and that they were aware of Pfizer's efforts to develop a new drug product for

the treatment of diabetes.  Defendants further admit that they lawfully began discussing the formation of Regor Therapeutics, Inc. while still employed at Pfizer and that in doing so, they had discussions with potential financial backers.  Defendants otherwise deny the allegations contained in paragraph 3.

4.    Denied.

5.    Denied as stated.  Defendants admit that QILU Regor is the assignee of certain patents and patent applications that claim some novel and inventive compounds in the class of glucagon-like peptide 1 (GLP-1) agonists in 2018 that may be useful in the treatment of diabetes and obesity.  Defendants otherwise deny the allegations contained in paragraph 5.

6.    Denied as stated.  Defendants admit that QILU Regor entered into an agreement with Eli Lilly and Company concerning the potential research and development of certain drug products and refer to the full text of that agreement for its contents.  Defendants  that Dr. M. Zhong sought and received permission from his immediate supervisor to retain his iPhone; that Dr. M. Zhong met with Pfizer IT personnel to have all Pfizer data wiped from his Pfizer iPhone; and that Dr. M. Zhong believed Pfizer's later request that he relinquish his Pfizer-issued iPhone was both unreasonable and unjustified in light of the fact that it had already been purged of Pfizer data. Defendants otherwise deny the allegations contained in paragraph 6.

7.    Paragraph 7 states legal conclusions to which no response is required.  To the extent a response is required, denied.

**PARTIES**

8.    Admitted.

9.    Denied as stated.  Defendants admit that a certificate of incorporation for Regor Therapeutics Inc. was filed listing Dr. M. Zhong and Dr. Qiu as directors of the company in May

of 2018.  Defendants further admit that Regor Therapeutics Inc. is a corporation incorporated in Delaware.  Defendants otherwise deny the allegations contained in paragraph 9.

10.     Denied as stated.  Defendants admit that QILU Regor exists and is incorporated under the laws of the People's Republic of China, and that it has a principal place of business at 1206 Zhangjiang Road, Building 10, Pudong New District, Shanghai 201210, China.  Defendants further admit that QILU Regor was originally funded in part with capital provided by Qilu Pharmaceutical Co. Ltd. and Shandong Qilu Pharmaceutical Group Co., Ltd.  Defendants also admit that Dr. M. Zhong and Dr. Qiu lawfully began discussing potential opportunities to start a biotech company while they were still employed by Pfizer. Defendants otherwise deny the allegations contained in paragraph 10.

11.     Denied as stated.  Defendant Xiayang Qiu is not a Connecticut citizen; while he owns a property in Connecticut, it is not his "home."

12.     Admitted.

13.     Denied as stated.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and therefore deny them.

## JURISDICTION AND VENUE

14.     The allegations in paragraph 14 state legal conclusions to which no response is required.  To the extent a response is required, denied.

15.     Denied as stated.  Defendants admit that they were employed by Pfizer at its Groton, Connecticut facility.  Defendants otherwise deny the allegations contained in paragraph 15.

16.     Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu were employed by Pfizer at Pfizer's Groton, Connecticut facility prior to June 12, 2018, but Defendants otherwise deny the allegations contained in paragraph 16.

## FACTUAL BACKGROUND

I.      **Pfizer Commits Massive Resources to Researching and Developing New Therapies, Including a Promising, Innovative Oral Diabetes-and-Obesity Medication**

17.     Denied as stated.   Defendants admit that Pfizer invests in research-and-development efforts but otherwise deny the allegations contained in paragraph 17.

18.     Denied as stated.   Defendants admit that Pfizer is engaged in the research, development, and commercialization of therapeutic products; that Pfizer employs scientists and clinicians who are engaged in such work, in addition to relying on acquisitions and commercialization agreements with other drug companies dedicated to research; that Pfizer has attempted to discover and develop new treatments for diabetes and obesity; and that not all of Pfizer's programs are successful.   Defendants otherwise deny the allegations contained in paragraph 18.

19.     Denied as stated.  Defendants admit that Type 2 diabetes is a health condition in which insulin produced by the body is unable to adequately control blood sugar levels.  Defendants further admit that tens of millions of Americans suffer from Type 2 diabetes.  Defendants admit that according to CDC estimates,[1] the cost of diagnosed diabetes in 2017 was $327 billion. Defendants otherwise deny the allegations contained in paragraph 19.

20.     Denied as stated.  Defendants admit that Pfizer had a program directed towards the discovery and development of GLP-1 receptor agonist medications and further admit that there are injectable medications targeting GLP-1 receptor.  Defendants further admit that many consumers may prefer oral medications over injections and that there was a strong interest in developing a

---

[1]   https://www.cdc.gov/chronicdisease/resources/publications/factsheets/diabetes-prediabetes.htm#:~:text=t%20have%20diabetes.-
,In%202017%2C%20the%20total%20estimated%20cost%20of%20diagnosed%20diabetes%20was,Are%20age%2045%20or%20older.

small-molecule-based oral medication targeting GLP-1 receptor.  Defendants further admit that Pfizer instituted a research program aimed at the discovery of a small-molecule-GLP-1 receptor agonist that could be delivered orally.  Defendants otherwise deny the allegations contained in paragraph 20.

21.    Denied as stated.  Defendants admit that prior to Dr. M. Zhong and Dr. Qiu's departure from Pfizer in June 2018, Pfizer had small molecule GLP-1 receptor agonists in research and development.  Defendants further admit that Pfizer has a program that sought to further develop the GLP-1 receptor agonist.  Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations and therefore deny them.

22.    Denied as stated.  Defendants admit that prior to Dr. M. Zhong and Dr. Qiu's departure from Pfizer on June 12, 2018, Pfizer had small molecule GLP-1 receptor agonists in research and development.  Defendants admit that Pfizer collaborated with external parties on the GLP-1 receptor, but lack sufficient knowledge to form a belief as to the truth of the specific allegations as stated in this paragraph and therefore deny them.

23.    Denied as stated.  Defendants admit that prior to Dr. M. Zhong and Dr. Qiu's departure from Pfizer on June 12, 2018, Pfizer had one or more small molecule GLP-1 receptor agonists in research and development.  Defendants aver that the Pfizer patent application claiming certain GLP-1 receptor agonist compounds became public on June 16, 2018 upon its publication in Canada, which is prior to the June 21, 2018 date alleged.  Defendants otherwise deny the allegations contained in paragraph 23.

24.    Denied as stated.  Defendants admit that Pfizer has published the results of certain clinical trials concerning danuglipron and that Pfizer has listed these and other clinical trials concerning danuglipron and a second molecule on the NIH website clinicaltrials.gov.  Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny them.

25.     Denied as stated.  Defendants admit that the FDA has approved oral semaglutide for the treatment of diabetes and that semaglutide is a peptide, and not a small molecule compound. Defendants further admit that there is a widely held understanding in the pharmaceutical industry that the GLP-1 receptor has been validated as a therapeutic target and that there could be substantial interest in a small molecule GLP-1 receptor agonist medication.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny them.

26.     Denied as stated.  Defendants admit that there is strong interest in developing new therapeutic options for diabetes and obesity patients beyond currently available medications. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny them.

## II.     To Protect Its Investments, Pfizer Safeguards Its Trade Secrets and Prohibits Current Employees from Launching Competing Enterprises

27.     Denied.

28.     Denied as stated.  Defendants admit that Pfizer and its corporate predecessors asked employees to sign certain agreements in connection with their employment and that those agreements may have contained terms relating to the non-disclosure and use of confidential Pfizer business information.  Defendants further admit that Pfizer provided periodic training with respect to certain corporate policies and procedures.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny them.

29.     Denied as stated.  Defendants admit that Pfizer has corporate policies related to the use of electronic devices.  To the extent paragraph 29 relies on these policies, Defendants refer to the text of those policies for their full contents.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny them.

30.     Denied as stated.  Defendants admit that Pfizer has corporate policies related to employee obligations.  To the extent paragraph 30 relies on the these policies, Defendants refer to the text of those policies for their full contents.  Defendants otherwise deny the allegations contained in paragraph 30.

31.     Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu may have executed certain agreements or participated in certain corporate training programs in connection with their employment with Pfizer (or predecessor entities) and refer to the text of those agreements and contents of such programs for their full contents.  Defendants otherwise deny the allegations contained in paragraph 31.

32.     Denied as stated.  Defendants admit that Dr. Qiu signed an employment agreement at the commencement of his employment.  To the extent paragraph 32 purports to quote from the Employment Agreement dated December 17, 2001, Defendants refer to the text of that agreement for its full contents.  Defendants otherwise deny the allegations contained in paragraph 32.

33.     Denied as stated.  Defendants admit on information and belief that Dr. M. Zhong likely received an offer letter.  To the extent paragraph 33 purports to quote from the offer letter, Defendants refer to the text of that letter for its full contents.  Defendants otherwise deny the allegations contained in paragraph 33.

34.     Denied as stated.  To the extent paragraph 34 purports to quote from the sample Patent, Trade Secrets, and Copyright Agreement, Defendants refer to the text of that agreement for its full contents.  Defendants otherwise deny the allegations contained in paragraph 34.

35.     Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu may have received written policies or participated in certain corporate training programs in connection with their employment with Pfizer (or predecessor entities) and refer to the text of those policies and the curriculum of such programs for their full contents.  Defendants otherwise deny the allegations contained in paragraph 35.

## III.   Defendants Scheme to Steal Pfizer Trade Secrets and Other Confidential Information to Compete Unlawfully with Pfizer

36.     Denied as stated.  Defendants admit that Dr. Qiu joined Pfizer in 2001 and that Dr. M. Zhong joined Pharmacia in 1999.  Defendants further admit that at the time of his resignation from Pfizer, Dr. Qiu's title was Executive Director and Head of Structural and Molecular Sciences. Defendants further admit that Dr. Qiu is one of the leading authorities in the industry in the field of structural biology, and that the field of structural biology includes the evaluation of how such compounds interact with proteins.   Defendants otherwise deny the allegations contained in paragraph 36.

37.     Denied as stated.  Defendants admit that Dr. M. Zhong's work at Pfizer included the management of third-party vendors on behalf of Pfizer's Pharmacokinetics, Dynamics & Metabolism ("PDM") group, and that Dr. M. Zhong was Director of Clinical Outsourcing for this group at the time of his departure from Pfizer on June 12, 2018.  Defendants further admit that their job responsibilities at Pfizer, while far broader, did include, at least indirectly, certain aspects of Pfizer's efforts to develop a small molecule GLP-1 receptor agonist product.  Defendants otherwise deny the allegations contained in paragraph 37.

38.     Denied as stated.   Defendants admit that Dr. Qiu was responsible for supervising over 50 employees who worked directly on dozens of Pfizer programs, including the GLP-1 receptor, and held various leadership positions, including membership on the Steering Committee that oversaw the development of specific technologies across multiple programs including the GLP-1 receptor. Defendants admit that Dr. M. Zhong and the group he supervised worked with research vendors.  Defendants otherwise deny the allegations contained in paragraph 38.

39.     Denied as stated.  Dr. M. Zhong and Dr. Qiu aver that they devoted themselves to Pfizer research and development for 19 and 17 years, respectively, but they were not obligated to work for Pfizer forever.   Defendants aver that their decisions to leave Pfizer came after Pfizer underwent numerous rounds of major mergers, acquisitions and reorganizations, which led to massive layoffs and headcount reductions.  For example, the acquisition of Wyeth in 2009 resulted in the reduction of 51,000 jobs by the end of 2013.[2]  This pattern continued throughout Dr. M. Zhong and Dr. Qiu's tenure at Pfizer until they resigned in 2018.  Both doctors oversaw and were forced to implement multiple rounds of layoffs within their groups.  Defendants further aver that these layoffs resulted in competent colleagues with potential to do life-saving work being let go, and Pfizer's research investment in its internal research staff being slashed.  Dr. M. Zhong and Dr. Qiu believed that many scientists were making larger impacts on health outcomes for millions of people more effectively and efficiently at start-ups.  Defendants otherwise deny the allegations contained in paragraph 39.

40.     Denied as stated.   Defendants admit that their jobs included supervisory or technology responsibilities that related to many Pfizer programs, including the GLP-1 program in

---

[2]  https://www.fiercepharma.com/financials/updated-pfizer-s-post-megamerger-cost-cutting-record-51-500-jobs-7-years.

2017.  Defendants further aver that in 2017, Dr. Qiu indicated to his supervisors at Pfizer that he would no longer implement new rounds of layoffs within his group.  Defendants otherwise deny the allegations contained in paragraph 40.

41.     Denied as stated.  Dr. M. Zhong and Dr. Qiu admit that they met on or about January 10, 2018, but aver that the "mid-age crisis" referenced in calendar entry referred to, if anything, Dr. Qiu and Dr. M. Zhong's determination that they would not participate in another round of lay-offs of their colleagues.  Defendants otherwise deny the allegations contained in paragraph 41.

42.     Denied as stated.  Defendants admit that Dr. Qiu traveled to Beijing, China in January 2018 and met with representatives of Qilu.  Defendants further admit that Dr. Qiu created a PowerPoint presentation with the title "QL visit topics of interest," but to the extent paragraph 42 purports to quote from the PowerPoint, Defendants refer to the text of that PowerPoint for its full contents.  Defendants otherwise deny the allegations contained in paragraph 42.

43.     Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu likely met with each other in early February of 2018.  Defendants otherwise deny the allegations contained in paragraph 43.

44.     Denied as stated.  Dr. M. Zhong and Dr. Qiu admit that they received trainings regarding security and conflicts policies.  To the extent that Defendants signed a document, Defendants refer to the text of that document for its full contents.  Defendants otherwise deny the allegations contained in paragraph 44.

45.     Denied as stated.  To the extent paragraph 45 purports to quote from an email, Defendants refer to the text of that email for its full contents.  Defendants otherwise deny the allegations contained in paragraph 45.

46.     Denied as stated.  To the extent paragraph 46 purports to quote from an email, presentation, or to-do list, Defendants refer to the text of that email, presentation, or to-do list for their full contents.  Defendants otherwise deny the allegations contained in paragraph 46.

47.     Denied as stated.  To the extent paragraph 47 purports to quote from a draft agreement, Defendants refer to the text of that agreement for its full contents.  Defendants otherwise deny the allegations contained in paragraph 47.

48.     Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu received and commented on draft agreements of a business proposal, but Defendants refer to the text of those agreements for their full contents.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation about what drafts Pfizer recovered from the Recycle Bin of any Pfizer computers.  Defendants otherwise deny the allegations contained in paragraph 48.

49.     Denied as stated.  To the extent paragraph 49 purports to quote from an email, Defendants refer to the text of that email for its full contents.  Defendants otherwise deny the allegations contained in paragraph 49.

50.     Denied as stated.  To the extent paragraph 50 references an email, Defendants refer to the text of that email for its full contents.  Defendants otherwise deny the allegations contained in paragraph 50.

51.     Denied as stated.  To the extent paragraph 51 refers to documents, Defendants refer to the text of those documents for their full contents.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny them.

52.     Denied as stated.  Defendants admit that Dr. M. Zhong accessed an internal Pfizer document related to certain Pfizer programs, including the GLP-1 program.  Defendants aver that

Dr. M. Zhong has not shared the GLP-1 program document with any third party and has not accessed or otherwise used the document since his departure from Pfizer.  To the extent paragraph 52 refers to documents, Defendants refer to the text of those documents for their full contents. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 52 and therefore deny them.

53.    Denied as stated.  Defendants aver that Dr. M. Zhong has not shared any Pfizer trade secrets related to the GLP-1 program with any third party and has not accessed or otherwise used the document alleged in paragraph 53 since his departure from Pfizer.  To the extent Plaintiff refers to a Pfizer cloud box account assigned to Dr. M. Zhong personally, Dr. M. Zhong avers that he no longer has access to such a cloud box account and has not had access since his resignation on June 12, 2018.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Pfizer's forensic analysis and therefore deny them.  To the extent paragraph 53 refers to documents, Defendants refer to the text of those documents for their full contents.  Defendants otherwise deny the allegations contained in paragraph 53.

54.    Denied as stated.  Defendants aver that Dr. M. Zhong has not shared any Pfizer trade secrets related to the GLP-1 program with any third party and has not accessed or otherwise used the document alleged in paragraph 54 since his departure from Pfizer.  To the extent paragraph 54 refers to a Pfizer document, Defendants refer to the text of that document for its full contents.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny them.

55.    Denied as stated.  Defendants admit that Dr. Qiu and Dr. M. Zhong lawfully began discussing potential opportunities to start a biotech company while employed at Pfizer. Defendants otherwise deny the allegations contained in paragraph 55.

56.     Denied as stated.  Defendants aver that to the extent such an email was ever forwarded to Dr. M. Zhong's personal email account, Dr. M. Zhong's access to and handling of this information was pursuant to his ongoing job responsibilities at Pfizer.  Defendants otherwise deny the allegations contained in paragraph 56.

57.     Denied as stated.  Defendants admit that Dr. M. Zhong traveled to Shanghai in April 2018 and met with certain Qilu personnel.  Defendants further admit that during the trip, Dr. M. Zhong toured available office spaces in Shanghai.  To the extent paragraph 57 refers to particular documents, Defendants refer to the text of those documents for their full contents.  Defendants otherwise deny the allegations contained in paragraph 57.

58.     Denied as stated.  To the extent paragraph 58 purports to quote from a "to do" list, Defendants refer to the text of that list for its full contents.  Defendants otherwise deny the allegations contained in paragraph 58.

59.     Denied as stated.  Defendants admit that on May 4, 2018, a certificate of incorporation for Regor Therapeutics Inc. was filed listing Dr. M. Zhong and Dr. Qiu as directors of the company.  Defendants deny any attempt to conceal the incorporation of Regor Therapeutics Inc. and aver that such incorporation is publicly available information readily searchable by Plaintiff.  Defendants aver that Qilu Regor was not founded until July 2018, only after which did Regor Therapeutics Inc. receive funding and became operational.  To the extent paragraph 59 purports to quote from a February 2021 press release, Defendants refer to the text of that release for its full contents.  Defendants otherwise deny the allegations contained in paragraph 59.

60.     Denied as stated.  Defendants deny that Dr. Qiu or Dr. M. Zhong disclosed Pfizer trade secrets to Qilu.  Defendants admit that QILU Regor was established with an initial Series A investment from Qilu.  To the extent that the allegations in paragraph 60 refer to a press release,

Defendants refer to the text of that release for its full contents.  Defendants otherwise deny the allegations contained in paragraph 60.

61.     Denied as stated, except to the extent that the allegations in paragraph 61 refer to a written agenda; Defendants refer to the full text of that agenda for its full contents.  Defendants otherwise deny the allegations contained in paragraph 61.

62.     Denied as stated.  Defendants admit that Dr. M. Zhong traveled to Shanghai in May 2018 and further admit that in May 2018 Dr. M. Zhong informed Pfizer that he was resigning from the company.  Defendants otherwise deny the allegations contained in paragraph 62.

63.     Denied as stated.  To the extent that the allegations in paragraph 63 refer to a PowerPoint presentation, Defendants refer to the text of that presentation for its full contents.  To the extent that the allegations in paragraph 63 refer to a written agenda, Defendants refer to the text of that agenda for its full contents.  Defendants otherwise deny the allegations contained in paragraph 63.

64.     Denied as stated.  To the extent that the allegations in paragraph 64 refer to an email or slide deck, Defendants refer to the text of that email or slide deck for their full contents.  Defendants otherwise deny the allegations contained in paragraph 64.

65.     Denied as stated.  Defendants admit that Dr. M. Zhong deleted certain work-related and/or personal files that he believed would no longer be relevant to any Pfizer personnel upon his departure, consistent with what he believed were best practices at Pfizer.  Defendants otherwise deny the allegations contained in paragraph 65.

66.     Denied as stated.  To the extent that the allegations in paragraph 66 refer to a PowerPoint document, Defendants refer to the contents of the PowerPoint document for the full text thereof.  Defendants otherwise deny the allegations contained in paragraph 66.

67.     Denied as stated.  Defendants admit that Dr. M. Zhong deleted certain job-related and/or personal files that he believed would no longer be relevant to any Pfizer personnel upon his departure, consistent with what he believed were best practices at Pfizer.  Defendants otherwise lack information sufficient to form a belief as to the truth of the allegations related to the deletion of documents.  To the extent that the allegations in paragraph 67 refer to particular documents, Defendants refer to the text of those documents for their full contents.  Defendants otherwise deny the allegations contained in paragraph 67.

68.     Denied as stated.  To the extent that the allegations in paragraph 68 refer to particular documents, Defendants refer to the full text thereof for the contents of the documents. Defendants otherwise deny the allegations contained in paragraph 68.

69.     Denied as stated.  To the extent that the allegations in paragraph 69 refer to particular documents, Defendants refer to the text thereof for the full contents of the documents. Defendants otherwise deny the allegations contained in paragraph 69.

70.     Denied as stated.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations related to Pfizer's forensic efforts and therefore deny them. Defendants otherwise deny the allegations contained in paragraph 70.

71.     Denied as stated.  To the extent that the allegations in paragraph 71 refer to particular documents, Defendants refer to the text thereof for the full contents of the documents. Defendants otherwise deny the allegations contained in paragraph 71.

72.     Denied as stated.  Defendants admit that before Dr. M. Zhong's departure, he engaged in some customary procedures related to departing employees.  Defendants otherwise deny the allegations contained in paragraph 72.

73.    Denied as stated.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations related to what Pfizer learned for the first time during the course of its investigation and therefore deny such allegations.  Defendants aver that Dr. M. Zhong sought and received permission from his immediate supervisor to retain his iPhone; that Dr. M. Zhong met with Pfizer IT personnel to have all Pfizer data wiped from his Pfizer iPhone; and that Dr. M. Zhong believed Pfizer's later request that he relinquish his Pfizer-issued iPhone was both unreasonable and unjustified in light of the fact that it had already been purged of Pfizer data. Defendants otherwise deny the allegations contained in paragraph 73.

74.    Denied as stated.  Defendants admit that before Dr. M. Zhong's departure, Dr. M. Zhong engaged in some customary procedures related to departing employees.  Defendants lack knowledge or information sufficient to form a belief as to what the activity logs reveal and what Pfizer has had an opportunity to inspect and therefore deny such allegations.  Defendants aver that Dr. M. Zhong sought and received permission from his immediate supervisor to retain his iPhone; that Dr. M. Zhong met with Pfizer IT personnel to have all Pfizer data wiped from his Pfizer iPhone; and that Dr. M. Zhong believed Pfizer's later request that he relinquish his Pfizer-issued iPhone was both unreasonable and unjustified in light of the fact that it had already been purged of Pfizer data.  Defendants otherwise deny the allegations contained in paragraph 74.

75.    Defendants admit that Dr. M. Zhong and Dr. Qiu ended their employment at Pfizer on June 12, 2018.  Defendants otherwise deny the allegations contained in paragraph 75.

IV.   **Defendants File Patent Applications Relying on Pfizer Trade Secrets**

76.    Denied as stated.  Defendants admit that the Pfizer patent application was published worldwide, but aver that it was published first on June 16, 2018 in Canada.  To the extent paragraph 76 purports to describe a patent application, Defendants refer to the text of that application for its full contents.  Defendants aver that once the Pfizer GLP-1 patent was published, all of the

structures described therein lost their status as confidential or trade secret information belonging to Pfizer.  Defendants otherwise deny the allegations contained in paragraph 76.

77.     Denied as stated.  Defendants aver that the '047 application for invention is independently developed intellectual property without the use of alleged trade secrets from Pfizer. Defendants admit that QILU Regor filed the '047 application and refer to the full texts of the '047 application for its contents.  Defendants otherwise deny the allegations contained in paragraph 77.

78.     Denied.

79.     Denied as stated.  Defendants admit that QILU Regor is the assignee of the '815 patent application; Defendants refer to the text of the '815 application for its full contents. Defendants further admit that the '815 patent application was published on May 28, 2020. Defendants otherwise deny the allegations contained in paragraph 79.

80.     Denied as stated.  Defendants refer to the text of the '815 application for its full contents.  Defendants otherwise deny the allegations contained in paragraph 80.

81.     Denied as stated.  Defendants admit that QILU Regor is the assignee of the '381 and the '474 patent applications; Defendants refer to the applications for their full contents. Defendants otherwise deny the allegations contained in paragraph 81.

82.     Denied as stated.  Defendants admit that QILU Regor is the assignee of patents related to molecule GLP-1 receptor agonist compounds and refer to their text for their contents. Defendants aver that the Regor team conducted broad salt screens at CROs to come up with its salt selection, and that the resulting candidates are distinct compounds from those claimed in the Pfizer patent.  Defendants further aver that citrate is one of the most common salts for drug products and is commonly used for many different compounds.  Defendants otherwise deny the allegations contained in paragraph 82.

83.     Denied as stated.  Defendants admit that QILU Regor is the assignee of patents related to CDK inhibitors.  Defendants otherwise deny the allegations contained in paragraph 83.

84.     Denied as stated.  Defendants admit that QILU Regor has completed Series B financing and plans to collaborate with Eli Lilly.  Defendants further admit that QILU Regor is party to an agreement with Eli Lilly and refer to the text of that document for its content. Defendants otherwise deny the allegations contained in paragraph 84.

## COUNT ONE

### Misappropriation of Trade Secrets Under the DTSA (All Defendants)

85.     To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if set forth fully herein.

86.     The allegations in paragraph 86 state legal conclusions to which no response is required.  To the extent a response is required, denied.

87.     Denied.

88.     Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu were subject to policies relating to confidentiality while employed at Pfizer and its predecessors in interest. Defendants further admit that Dr. M. Zhong and Dr. Qiu received some training about confidentiality of Pfizer information.   To the extent paragraph 88 references employment agreements, Defendants refer to the text of those agreements for their full contents.  Defendants otherwise deny the allegations contained in paragraph 88.

89.     Denied.

90.     The allegations in paragraph 90 state legal conclusions to which no response is required.  To the extent a response is required, denied.

91.     Denied as stated.  Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations relating to the forensic review and therefore deny them.

92.     Denied as stated.  Defendants admit that Dr. Qiu and Dr. M. Zhong had access to certain Pfizer confidential information due to their job responsibilities.  Defendants otherwise deny the allegations contained in paragraph 92.

93.     The allegations in paragraph 93 state legal conclusions to which no response is required.  To the extent a response is required, denied.

94.     The allegations in paragraph 94 state legal conclusions to which no response is required.  To the extent a response is required, denied.

95.     The allegations in paragraph 95 state legal conclusions to which no response is required.  To the extent a response is required, denied.

96.     The allegations in paragraph 96 state legal conclusions to which no response is required.  To the extent a response is required, denied.

97.     The allegations in paragraph 97 state legal conclusions to which no response is required.  To the extent a response is required, denied.

98.     The allegations in paragraph 98 otherwise state legal conclusions to which no response is required.  To the extent a response is required, denied.

## COUNT TWO

### Misappropriation of Trade Secrets Under the CUTSA (All Defendants)

99.     To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if set forth fully herein.

100.    The allegations in paragraph 100 state legal conclusions to which no response is required.  To the extent a response is required, denied.

101.    Denied as stated.  Defendants aver that once the Pfizer GLP-1 patent was published, all of the structures described therein lost their status as confidential or trade secret information belonging to Pfizer.  Defendants otherwise deny the allegations contained in paragraph 101.

102.    Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu were subject to policies relating to confidentiality while employed at Pfizer and its predecessors in interest. Defendants further admit that Dr. M. Zhong and Dr. Qiu received some training about confidentiality of Pfizer information.  To the extent paragraph 102 references employment agreements, Defendants refer to the text of those agreements for their full content.  Defendants otherwise deny the allegations contained in paragraph 102.

103.    Denied as stated.  Defendants admit that Dr. M. Zhong and Dr. Qiu were subject to policies relating to confidentiality while employed at Pfizer and its predecessors in interest.  To the extent paragraph 102 references certain information or documents, Defendants refer to the text of those for their full contents.  Defendants otherwise deny the allegations contained in paragraph 103.

104.    The allegations in paragraph 104 state legal conclusions to which no response is required.  To the extent a response is required, denied.

105.    Denied as stated.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph relating to the forensics review and therefore deny them.  To the extent any other response is required, denied.

106.    Denied as stated.  Defendants admit that Dr. Qiu and Dr. M. Zhong had access to certain Pfizer confidential information due to their job responsibilities.  Defendants otherwise deny the allegations contained in paragraph 106.

107.    The allegations in paragraph 107 state legal conclusions to which no response is required.  To the extent a response is required, denied.

108.    The allegations in paragraph 108 state legal conclusions to which no response is required.  To the extent a response is required, denied.

109.    The allegations in paragraph 109 state legal conclusions to which no response is required.  To the extent a response is required, denied.

110.    The allegations in paragraph 110 state legal conclusions to which no response is required.  To the extent a response is required, denied.

111.    The allegations in paragraph 111 state legal conclusions to which no response is required.  To the extent a response is required, denied.

112.    The allegations in paragraph 112 state legal conclusions to which no response is required.  To the extent a response is required, denied.

## COUNT THREE

### Breach of Contract Under New York Law (Qiu)

113.    To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if set forth fully herein.

114.    Denied as stated.  Defendants admit that Dr. Qiu knowingly entered into the Employment Agreement with Pfizer in 2001.  Defendants further aver that the allegations in paragraph 114 state legal conclusions to which no response is required.  To the extent a response is required, denied.

115.    Denied as stated, except to the extent that the allegations in paragraph 115 quote from the Employment Agreement dated December 17, 2001; Defendants refer to the text of that agreement for its full contents.  Defendants otherwise deny the allegations contained in paragraph 115.

116.    The allegations in paragraph 116 state legal conclusions to which no response is required.  To the extent a response is required, denied.

117.    The allegations in paragraph 117 state legal conclusions to which no response is required.  To the extent a response is required, denied.  During the course of his employment, Qiu

was able to obtain confidential, proprietary, and trade-secret information from Pfizer, which was covered by the terms of the Employment Agreement.

118. The allegations in paragraph 118 state legal conclusions to which no response is required. To the extent a response is required, denied.

119. The allegations in paragraph 119 state legal conclusions to which no response is required. To the extent a response is required, denied.

120. The allegations in paragraph 120 state legal conclusions to which no response is required. To the extent a response is required, denied.

121. Denied as stated, except to the extent that the allegations in paragraph 121 purport to quote from the employment agreement; Defendants refer to the text of that agreement for its full contents. Defendants otherwise deny the allegations contained in paragraph 121.

122. The allegations in paragraph 122 state legal conclusions to which no response is required. To the extent a response is required, denied.

## COUNT FOUR

### Breach of Contract Under Connecticut Law (Zhong)

123. To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if set forth fully herein.

124. Denied as stated. Defendants further aver that the allegations in paragraph 124 state legal conclusions to which no response is required. To the extent a response is required, denied.

125. Denied as stated, except to the extent that the allegations in paragraph 125 quote from the Patent, Trade Secrets, and Copyright Agreement; Defendants refer to the text of that agreement for its full content. Defendants otherwise deny the allegations contained in paragraph 125.

126.     Denied as stated, except to the extent that the allegations in paragraph 126 quote from the Patent, Trade Secrets, and Copyright Agreement; Defendants refer to the full text of that agreement for its full contents.  Defendants otherwise deny the allegations contained in paragraph 126.

127.     The allegations in paragraph 127 state legal conclusions to which no response is required.  To the extent a response is required, denied.

128.     The allegations in paragraph 128 state legal conclusions to which no response is required.  To the extent a response is required, denied.

129.     The allegations in paragraph 129 state legal conclusions to which no response is required.  To the extent a response is required, denied.

130.     The allegations in paragraph 130 state legal conclusions to which no response is required.  To the extent a response is required, denied.

131.     The allegations in paragraph 131 state legal conclusions to which no response is required.  To the extent a response is required, denied.

132.     The allegations in paragraph 132 state legal conclusions to which no response is required.  To the extent a response is required, denied.

## COUNT FIVE

### Breach of Fiduciary Duty Under Connecticut Law (Zhong and Qiu)

133.     To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if set forth fully herein.

134.     Denied as stated.  Defendants admit that Dr. M. Zhong held a position as Director of Clinical Outsourcing for Pfizer's PDM group and that Dr. Qiu held a position as Executive Director and Head of Structural and Molecular Sciences.  Defendants further admit that Dr. M. Zhong and Dr. Qiu supervised employees as part of their Pfizer duties and had access to non-public

information related to Pfizer's business activities and interests at that time.  Otherwise, the allegations in paragraph 134 state legal conclusions to which no response is required. To the extent a response is required, denied.

135.    The allegations in paragraph 135 state legal conclusions to which no response is required.  To the extent a response is required, denied.

136.    The allegations in paragraph 136 state legal conclusions to which no response is required.  To the extent a response is required, denied.

137.    The allegations in paragraph 137 state legal conclusions to which no response is required.  To the extent a response is required, denied.

138.    The allegations in paragraph 138 state legal conclusions to which no response is required.  To the extent a response is required, denied.

139.    The allegations in paragraph 139 state legal conclusions to which no response is required.  To the extent a response is required, denied.

## COUNT SIX

### Breach of the Duty of Loyalty Under Connecticut Law (Zhong and Qiu)

140.    To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if set forth fully herein.

141.    Denied as stated.  Defendants admit that Dr. M. Zhong held a position as Director of Clinical Outsourcing for Pfizer's PDM group and that Dr. Qiu held a position as Executive Director and Head of Structural and Molecular Sciences.  Defendants further admit that Dr. M. Zhong and Dr. Qiu supervised employees as part of their Pfizer duties and had access to non-public information related to Pfizer's business activities and interests at that time.  Otherwise, the allegations in paragraph 141 state legal conclusions to which no response is required. To the extent a response is required, denied.

142.    The allegations in paragraph 142 state legal conclusions to which no response is required.  To the extent a response is required, denied.

143.    The allegations in paragraph 143 state legal conclusions to which no response is required.  To the extent a response is required, denied.

144.    The allegations in paragraph 144 state legal conclusions to which no response is required.  To the extent a response is required, denied.

145.    The allegations in paragraph 145 state legal conclusions to which no response is required.  To the extent a response is required, denied.

146.    The allegations in paragraph 146 state legal conclusions to which no response is required.  To the extent a response is required, denied.

## COUNT SEVEN

### Unfair and Deceptive Trade Practices Under CUTPA (All Defendants)

147.    To the extent a response is required, Defendants re-allege and incorporate the responses set forth in the preceding paragraphs as if set forth fully herein.

148.    The allegations in paragraph 148 state legal conclusions to which no response is required.  To the extent a response is required, denied.

149.    The allegations in paragraph 149 state legal conclusions to which no response is required.  To the extent a response is required, denied.

150.    The allegations in paragraph 150 state legal conclusions to which no response is required.  To the extent a response is required, denied.

151.    The allegations in paragraph 151 state legal conclusions to which no response is required.  To the extent a response is required, denied.

152.    The allegations in paragraph 152 state legal conclusions to which no response is required.  To the extent a response is required, denied.

153.    The allegations in paragraph 153 state legal conclusions to which no response is required.  To the extent a response is required, denied.

154.    The allegations in paragraph 154 state legal conclusions to which no response is required.  To the extent a response is required, denied.

155.    The allegations in paragraph 155 state legal conclusions to which no response is required.  To the extent a response is required, denied.

## ANSWER TO PLAINTIFF'S PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to a judgment and/or any relief requested in the Prayer for Relief set forth in the Complaint.

## AFFIRMATIVE DEFENSES

Defendants raise the following defenses and affirmative defenses without waiver of any others that may be available to it.  Defendants specifically reserve the right to raise any additional defenses and affirmative defenses at any time during the pendency of these proceedings, including any and all which may come to light through discovery or otherwise.  In alleging these defenses and affirmative defenses, Defendants do not assume any burden of proof, persuasion, or production not otherwise legally assigned it.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim for which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

At all relevant times, Defendants acted in good faith and in accordance with all applicable statutory and common law obligations.  Moreover, Defendants did not directly or indirectly perform any acts that would constitute a violation of any rights of Plaintiff or any duty owed to the Plaintiff.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred in whole or in part by the doctrines of laches.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred in whole or in part by the doctrines of waiver, consent, and acquiescence.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred in whole or in part because the Plaintiff, through its acts, conduct, and omissions, ratified the alleged conduct of which it now complains.

### SIXTH AFFIRMATIVE DEFENSE

To the extent Plaintiff's claims arise from one or more nuclei of operative fact which could give rise to claims under CUTSA and/or DTSA, those claims are preempted by CUTSA and/or DTSA.

### SEVENTH AFFIRMATIVE DEFENSE

To the extent Plaintiff's claims arise from one or more nuclei of operative fact which could give rise to claims under 17 U.S.C. § 101, *et seq.* (the United States Copyright Act), those claims are preempted by that statutory scheme.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred in whole or in part by the doctrines of equitable estoppel.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, on the grounds that the purported trade secret information was readily ascertainable by proper means at the time of the alleged misappropriation.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred also on the grounds that Plaintiff's invention of compounds claimed in the patents was done independently of any Pfizer trade secret or confidential information.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, on the grounds that Plaintiff failed to take reasonable measures to protect alleged trade secrets.

### TWELFTH AFFIRMATIVE DEFENSE

One or more of Plaintiff's claims are barred by the applicable statute of limitations even as tolled.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims and causes of action relating to trade secret misappropriation or use of confidential information, including but not limited to alleged violations of the Connecticut Uniform Trade Secret Act and the Defend Trade Secrets Act, or any contract or common law claim, should be barred in whole or in part on one or more of the following grounds:

a. Defendants have not misappropriated any trade secrets or confidential information belonging to Plaintiff;

b. Plaintiff cannot establish that Defendants misused or disclosed trade secrets or other confidential or proprietary information belonging to Plaintiff;

c. Any Pfizer information used or transferred by Defendants contained no confidential, proprietary, or trade secret information belonging to Plaintiff;

d. Plaintiff does not allege with particularity or properly define what alleged trade secrets they are trying to protect;

e.   Plaintiff has failed to establish that any of the information they seek to protect rises to the level of or should be classified as a legal trade secret;

f.   Plaintiff's alleged trade secrets were already in the public domain and/or Plaintiff shared this information with other third parties;

g.   Plaintiff's alleged trade secrets were readily ascertainable or known to or within the industry shared by Plaintiff and Defendants;

h.   Defendants never relied on any such alleged trade secrets, took precautions to prevent the use of any such alleged trade secrets, and/or independently developed any accused inventions or technology;

i.   To the extent Plaintiff's information could constitute trade secret information, Plaintiff failed to take efforts that were reasonable under the circumstances to protect such alleged trade secrets from disclosure; and/or

j.   Any other statutory or common law exclusions.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims regarding and/or referencing a breach of contract should be barred in whole or in part because:

a.   Plaintiff cannot show the existence of valid, binding, and/or enforceable employment agreements among the relevant parties;

b.   Plaintiff cannot show that the relevant Defendants executed the specific "employment agreements" referenced and alleged in Plaintiff's Complaint;

c.   Plaintiff cannot show consideration sufficient to establish the existence of continued obligations with regard to any of the employment agreement(s) alleged

in Plaintiff's Complaint, including with regard to any Pharmacia employment agreement alleged in the Complaint;

d.  Plaintiff has failed to allege or identify the entire scope of contractual terms applicable to each particular Defendant's employment with Plaintiff, and has apparently withheld and/or suppressed terms that are unfavorable to Plaintiff;

e.  Plaintiff's purported employment agreements contain contradictory and/or ambiguous terms that render the agreements unintelligible and/or unenforceable as drafted;

f.  Plaintiff, as sole drafter of the alleged employment agreements, must bear the consequences of any ambiguities in the alleged agreements' written terms, and any such terms must be construed against Plaintiff, under the doctrine of contra proferentem;

g.  Plaintiff alleges agreements that are contracts of adhesion, which must be construed against Plaintiff under the doctrine of contra proferentem;

h.  Plaintiff has alleged agreements containing restrictive covenants that are unenforceable under applicable law and which are contrary to public policy in applicable jurisdictions;

i.  Plaintiff alleges agreements that are unenforceable to the extent they contain foreign choice of law provisions with regard to employees based in Connecticut, where the alleged agreements bear no significant connection to those foreign jurisdictions;

j.  Plaintiff cannot show the existence of an assignable invention based on any inventive contribution from Dr. M. Zhong and Dr. Qiu;

k.  Plaintiff cannot show the existence of an assignable invention during the period of Dr. M. Zhong and Dr. Qiu's employment with Plaintiff;

l.  Plaintiff has failed to perform its obligations under the alleged agreements;

m.  Defendants did not breach any agreements.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Defendants' conduct was undertaken in the good faith exercise of a valid and legitimate business purpose.

## SIXTEENTH AFFIRMATIVE DEFENSE

One or more of Plaintiff's claims are barred under the economic loss rule.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Defendants did not owe any fiduciary duty or duty of loyalty to Plaintiff as alleged in the Complaint. To the extent that any such duty of loyalty or fiduciary duty was owed, Defendants did not breach their duties of loyalty or fiduciary duties to Plaintiff.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred in whole or in part because Plaintiff has not suffered any cognizable damage or injury.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for damages are speculative, ambiguous, and illusory, and any award of damages against any of the Defendants would be improper.

## TWENTIETH AFFIRMATIVE DEFENSE

Defendants cannot be held liable for any punitive, exemplary, or other similar damages, such as treble damages, because the Defendants at all times made good faith efforts to comply with the law. Defendants deny that punitive and/or exemplary damages against Defendants are

warranted, because at no time did Defendants act wrongfully or with malice, bad faith, or reckless indifference toward Plaintiff's rights under the law.

**TWENTY FIRST AFFIRMATIVE DEFENSE**

With regard to Plaintiff's claims for trade secret misappropriation and any claim based upon the same nuclei of operative facts, Plaintiff may not obtain exemplary damages or attorneys' fees, because Plaintiff failed to give the required notice of immunity under 18 U.S.C. § 1833(b).

**TWENTY SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by their failure to mitigate their alleged losses or damages.

**TWENTY THIRD AFFIRMATIVE DEFENSE**

Plaintiff comes to the Court with unclean hands that preclude any award of equitable relief, including because

a. Plaintiff brings this suit in a naked attempt to stifle competition;

b. Plaintiff has brought this suit in bad faith;

c. Plaintiff failed to conduct an adequate investigation before bringing suit;

d. Plaintiff brought suit with an improper motivation to cause reputational harm to Defendants;

e. Plaintiff has attempted to impose unenforceable employment terms on the relevant Defendants;

f. Plaintiff has attempted to impose unenforceable employment terms in a manner contrary to public policy and the public interest;

g.  Plaintiff failed to give required notice of immunity under DTSA (*e.g.*, 18 U.S.C. § 1833(b)) to Dr. M. Zhong and Dr. Qiu.

## TWENTY FOURTH AFFIRMATIVE DEFENSE

Plaintiff would be unjustly enriched if awarded any damages.

## TWENTY FIFTH AFFIRMATIVE DEFENSE

Plaintiff's request for injunctive relief should be barred in whole or in part on one or more of the following grounds:

a.  Plaintiff cannot demonstrate a likelihood of success on the merits of its claims;

b.  Plaintiff cannot demonstrate that any harm it will allegedly suffer by Defendants' allegedly wrongful conduct (which is denied) is or will be irreparable;

c.  Plaintiff has an adequate remedy at law and/or cannot establish that a monetary remedy will be insufficient to make Plaintiff whole;

d.  Plaintiff's undue delay shows that there is no irreparable harm and no threat of irreparable harm to Plaintiff in the future;

e.  Defendants have justifiably relied on Plaintiff's acts, conduct, delay, omissions, and communications in pursuing their legitimate competitive efforts;

f.  Plaintiff possesses sufficient market power that it cannot show irreparable harm based on Defendants' entry into the marketplace, particularly in light of Plaintiff's history of licensing intellectual property to third parties;

g.  The harms suffered by one or more of the Defendants, if enjoined, will greatly outweigh the harm that may be suffered by Plaintiffs if an injunction is not issued;

h.  Injunctive relief does not serve, and will in fact harm, the public interest, including but not limited to the public's interest in competition and freedom of movement among employment opportunities.

## TWENTY SIXTH AFFIRMATIVE DEFENSE

For pharmaceutical drugs that prolong and save lives, there is a critical public interest in both (1) affordable access to those drugs and (2) free competition to explore and invent new compounds that can save lives with a greater degree of effectiveness and comfort than other options on the market.  This bolsters each of the responses and defenses raised above, and independently precludes imposition of an injunction in this case.

## ADDITIONAL DEFENSES

Defendants have not knowingly or intentionally waived any applicable affirmative or other defense and reserve the right to rely upon such defenses as may become available or apparent. Defendants further reserve the right to amend this Answer and/or affirmative defenses accordingly, and/or to withdraw affirmative defenses that Defendants determines are not applicable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendants demand trial by jury in this action of all issues so triable, except where those claims have been dismissed.

## DEFENDANT'S PRAYER FOR RELIEF

Defendants respectfully request that the Court enter judgment in its favor and against Plaintiff, that Plaintiff take nothing against Defendants by its suit, and that the Court grant Defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Without waiver of any of their rights, including the right to seek dismissal and/or transfer of this action, Counterclaim Plaintiffs QILU Regor, Regor Therapeutics Inc., Dr. Xiayang Qiu ("Dr. Qiu"), and Dr. Min Zhong ("Dr. M. Zhong") (collectively, the "Regor Parties" and/or "Counterclaim Plaintiffs"), through their counsel, hereby allege and assert the following

Counterclaims against Counterclaim Defendant Pfizer Inc. ("Pfizer," "Plaintiff," and/or "Counterclaim Defendant").

## NATURE OF THE COUNTERCLAIM ACTION

1.     These Counterclaims are brought by the Regor Parties pursuant to Rule 13 of the Federal Rules of Civil Procedure seeking: (1) declarations that Dr. M. Zhong and Dr. Qiu did not misappropriate any trade secrets from Counterclaim Defendant; (2) declarations that Dr. M. Zhong and Dr. Qiu did not breach their contracts with, or breach other duties owed to, Counterclaim Defendant; and (3) declarations of ownership of Patent Application Nos. PCT/CN2018/117047, WO2020/103815, PCT/CN2019/082381, WO2020/207474, PCT/CN2020/092530, and WO2021/242817 (collectively, the "QILU Regor Patents") and any other applications or patents that may issue based on, or claiming priority to, the QILU Regor Patents.

## PARTIES

2.     Dr. M. Zhong is a citizen of the United States.  Although Dr. M. Zhong maintains a residence in Connecticut, his primary residence is in Shanghai, China.

3.     Dr. Qiu is a citizen of the United States, with his primary residence in Shanghai, China.

4.     Regor Therapeutics Inc. is a Delaware corporation, with its principal place of business in 2018 and 2019 at 50 Soldiers Field Place, Boston, Massachusetts 02135.

5.     QILU Regor Therapeutics Inc. ("QILU Regor") is a company, founded in July 2018, organized and existing under the laws of the People's Republic of China, with its principal place of business at No. 1206 Zhangjiang Rd, Building 10, Pudong District, Shanghai, China.

6.     Pfizer Inc. is, on information and belief, a Delaware corporation, with its principal place of business at 235 East 42nd Street, New York, New York 10017.

## JURISDICTION AND VENUE

7.      These Counterclaims arise under the Declaratory Judgment Act, 28 U.S.C § 2201 *et seq.*, and seek relief for which this Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

8.      For purposes of the Regor Parties' Counterclaims set forth herein, venue is proper in this district under 28 U.S.C. § 1391 because: (1) Counterclaim Defendant resides in this district; (2) this action was filed in this district by Counterclaim Defendant and Counterclaim Defendant has thus submitted to personal jurisdiction in this Court and has consented to this venue; and (3) the present Counterclaims are in response to the allegations raised in Counterclaim Defendant's Complaint.

9.      This Court has personal jurisdiction over Counterclaim Defendant at least by virtue of Counterclaim Defendant's consent to the personal jurisdiction of this Court by the filing of the Complaint against the Regor Parties in this Court.

## SUMMARY OF THE DISPUTE

10.      Counterclaim Plaintiffs bring their claims in response to the belated and ill-founded claims by Pfizer that seek to impugn the integrity of Regor's founders and undermine Regor's reputation among its investors and collaboration partners.

11.      Counterclaim Plaintiffs Dr. Qiu and Dr. M. Zhong resigned from Pfizer effective June 12, 2018, approximately *45 months ago*. Between their June 12, 2018 departure and Pfizer's filing of its complaint on February 2, 2022, Pfizer never contacted Drs. Qiu or M. Zhong to ask any questions or express any concerns about the circumstances of their departure from Pfizer; their founding of QILU Regor; or any of the facts alleged in Pfizer's complaint.

12.     Had Pfizer timely alerted Counterclaim Plaintiffs of their alleged concerns, they could have been addressed in an orderly and commercially reasonable manner.  Information could have been exchanged, and, where appropriate, QILU Regor could have made certain commitments to allay Pfizer's concerns, if any were valid, regarding the potential use of Pfizer confidential information.  Such discussion and arrangements are standard in the pharmaceutical industry, where the stakes are high and employee movement among competitors is commonplace.  For example, on information and belief, Pfizer routinely hires scientific and business experts from its competitors to work in research and development programs in the same therapeutic areas as in their former employment.

13.     Pfizer's years-long delay in asserting its claims departs from standard and reasonable industry practices for enforcement of safeguards relating to proprietary or confidential information potentially in the possession of former employees.  Since June 2018, Pfizer has had the opportunity to observe the scientific and business progress made by QILU Regor, and to calculate the potential benefit to Pfizer that would result from an unjustified disruption to QILU Regor's internal and external programs and relationships (*e.g.*, via this bad faith lawsuit).

14.     Since its founding in July 2018, QILU Regor has been engaged in vigorous work aimed at the research and development of novel, small molecule drugs to address the unmet medical needs of patients around the world in a number of therapeutic categories.  As set forth more fully below, based on the strength of its own research, QILU Regor has filed dozens of patents and has entered into collaboration and licensing agreements with industry partners, including Eli Lilly, the world leader in the development of medications for metabolic disorders, including diabetes.

15.     QILU Regor and Pfizer are each attempting to develop an oral small-molecule medication directed at the GLP-1 receptor that would have the potential to treat diabetes and a range of other diseases.  The GLP-1 receptor target has been known as a valid therapeutic target for more than 15 years, and many companies including Pfizer and its competitors Eli Lilly and QILU Regor are pursuing it.  Rather than embrace such lawful and fair competition for the benefit of hundreds of millions of patients, Pfizer now asserts that QILU Regor's successes should actually belong to Pfizer, and Pfizer is pursuing a broad range of claims to that effect.

16.     Pfizer bases its claims on the fact that Dr. M. Zhong and Dr. Qiu are former Pfizer employees who supervised scientists involved in the development of Pfizer's GLP-1 agonist compounds.  Pfizer alleges that Dr. M. Zhong and Dr. Qiu misappropriated trade secrets as they left Pfizer, that they breached their contracts, and that they breached their duties of loyalty. Pfizer has spun a story that these two scientific managers became disgruntled at not being promoted, and nefariously planned to build a competitive business based on a foundation of stolen trade secrets.  But Dr. M. Zhong and Dr. Qiu did no such thing.  QILU Regor's research and patents were the result of diligent efforts that did not rely on any Pfizer trade secrets or confidential information, and instead relied exclusively on QILU Regor's own innovations and novel improvements over previously-disclosed chemical structures.

17.     Dr. M. Zhong and Dr. Qiu left Pfizer because they felt they could do more good elsewhere.  And they are doing just that, by helping to lead the strategic decision-making at QILU Regor, a promising new biotechnology company that has produced over 30 patents spanning ten drug targets in three therapeutic areas and created over 100 high paying jobs since its inception in July of 2018.  At Pfizer, Dr. M. Zhong and Dr. Qiu saw an organization that had become reliant on buying innovative drug candidates from outside sources while repeatedly

shrinking its internal research and development efforts. Even though their own careers were progressing at Pfizer, they grew tired of seeing so many talented and respected colleagues let go. After years of loyal service, they felt it was time for something new, and which would have a more direct impact on drug development and public health. Had Drs. Zhong and Qiu stayed in Pfizer, it would not have been possible for them to have accomplished so much in their respective careers in the last three to four years.

18.     Now, Pfizer's lawsuit has cast a cloud over QILU Regor. Not only should Pfizer's affirmative claims fail, but QILU Regor needs to know that Pfizer will not continue to assert ownership over future QILU Regor discoveries based solely on Dr. M. Zhong's and Dr. Qiu's work history at Pfizer. Thus, QILU Regor seeks the declaratory relief described herein, to permanently clear the air of any possibility that Pfizer will claim ownership over its inventions.

## GENERAL ALLEGATIONS

### I.     The Complaint

19.     On February 2, 2022, Counterclaim Defendant filed a Complaint against the Regor Parties, alleging, *inter alia,* misappropriation of trade secrets under federal and Connecticut law and unfair trade practices under Connecticut law.

20.     In its Complaint, Counterclaim Defendant seeks an order directing assignment to Pfizer and a judgment that Pfizer is the "rightful owner" of the QILU Regor Patents and "any other applications or patents that have issued or may issue based on or claiming priority to the same."

### II.     The QILU Regor Patents

21.     The QILU Regor Patents are all directed to GLP-1 receptor agonists, which aim to address the public health concerns connected with metabolic and cardiovascular diseases, most notably diabetes and obesity.

22.     The QILU Regor Patents list non-party Dr. Wenge Zhong ("Dr. W. Zhong") as either a sole or joint inventor and were all filed by QILU Regor.  QILU Regor is the owner, by assignment, of all rights, title, and interest in and to the QILU Regor Patents.

### III.     Dr. W. Zhong's Inventions of the QILU Regor Patents

23.     Dr. W. Zhong has served as the Chief Technology Officer of QILU Regor since July 18, 2018.  Prior to joining QILU Regor, Dr. W. Zhong was the Senior Director, Head of Discovery Modalities at Amgen's Asia Research and Development Center, in Shanghai, from 2014 to July 2018.  Prior to that, he spent fourteen years working at Amgen in other capacities. At Amgen, his role as Senior Director, Head of Discovery Modalities was to manage the group of scientists in research related to structural biology, protein sciences, medicinal chemistry, computational chemistry, and antibody discovery.  Dr. W. Zhong has never been employed by Counterclaim Defendant.

24.     Dr. W. Zhong is a medicinal chemist, colloquially known as a "drug hunter" in the pharmaceutical industry, and has a broad research background, with experience ranging from designing and synthesizing molecules, to studying their functions in bioassays (such as cell-based assays), to evaluating their properties and efficacy in preclinical animal studies.  He studied bio-organic chemistry in graduate school, receiving a master's degree in chemistry from Rutgers University, and then a Ph.D. from the California Institute of Technology in 1998.  He further developed an expertise in chemical synthesis during his postdoctoral work at The Scripps Research Institute in San Diego.  Dr. W. Zhong brought three essential skills to his work at

QILU Regor: 1) designing molecules; 2) synthesizing the molecules that he designed; and 3) leading multi-disciplinary teams to successfully deliver candidate molecules.  His ability to envision intermolecular interactions in his mind and lead multidisciplinary teams makes him well equipped to spearhead challenging drug discovery efforts.

25.     Dr. W. Zhong's responsibilities at QILU Regor have included leading its research programs, especially through the most important steps of inventing novel chemical compounds with desirable drug-like properties.  He has built and led a team of talented scientists and created an efficient drug discovery and development ecosystem amongst numerous world-leading contract research organizations ("CROs") that are locally based in Shanghai.

26.     In addition to leading drug discovery projects, Dr. W. Zhong's responsibilities at QILU Regor have also included building and developing a proprietary Computer Accelerated Rational Discovery ("CARD") platform.  QILU Regor started by hiring computational chemists and acquiring software from commercial sources, and later created its own proprietary software algorithms and virtual libraries.  Since a number of GLP-1 and closely related receptors' complex structures are available in the literature, Dr. W. Zhong and his computational chemists built proprietary models of the GLP-1 receptor interacting with agonist compounds, and further refined the models using structure–activity relationship ("SAR") results and mutagenesis studies. The CARD platform has steadily evolved into a fully-integrated platform that includes internal capabilities in structural biology and computational biology as well as collaborations with leading academic and industrial institutions.  To date, QILU Regor has determined over 70 co-crystal structures, across multiple drug targets in complex with small-molecule ligands, and was among the first to publish such co-structures of the GLP-1 receptor in top scientific journals. The CARD platform is now used consistently to facilitate target prioritization, decision making,

and acceleration of the entire discovery process, as evident from the over 30 patents filed by QILU Regor for ten drug discovery programs across three therapeutic areas in less than 4 years, which would not have been possible with such a small group of scientists within Pfizer's large but inefficient R&D organization.

27.     Dr. W. Zhong, along with the other founders of what was to become QILU Regor, met on June 14-15, 2018 in Shanghai.  At this meeting they discussed, among other things, possible drug targets to propose to potential QILU Regor investors so that their research efforts could begin in earnest.  Among the more than a dozen other potential projects discussed across multiple therapeutic areas, an oncology project was labelled as a "quick win" against a protein target that did not overlap or compete with Pfizer according to public knowledge.  In the area of metabolic diseases, the idea of pursuing GLP-1 receptor agonists was well received, as there was a clear unmet need in the medical market for an efficacious small-molecule GLP-1 receptor agonist for diabetes treatment that could be delivered via an oral medication.  For his part, Dr. W. Zhong, a world-class expert in GPCR targets (GLP-1 receptor is a member of this privileged target class), had broad knowledge of GLP-1 receptor research activities across the drug industry and a personal interest as his family members suffer from diabetes.

28.     As Dr. W. Zhong and his future colleagues were well aware, GLP-1 receptor agonists were widely known as effective diabetes treatments, with multiple injectable medications (in the form of peptides) available to consumers.  An orally available small-molecule drug targeting the GLP-1 receptor has been considered a breakthrough for many drug hunters because of its convenient oral administration and relatively low manufacturing cost, which would likely translate into significant benefits for hundreds of millions of diabetes patients

around the world.  Accordingly, the GLP-1 receptor was one of the most obvious targets to pursue for Dr. W. Zhong when he began his research at QILU Regor.

29.     Dr. W. Zhong and his colleagues were aware that numerous other drug companies were focused on developing orally administrable GLP-1 receptor agonists and, if they were to be successful in this field, they would have to work quickly.  As early as 2009, a TransTech Pharma, Inc. ("TTP") patent publication, Patent Application No. WO2009/111700 A2 ("'700 patent application") established the feasibility of targeting the GLP-1 receptor using small-molecule compounds.  On March 29, 2018, a patent filed by Chugai Pharmaceutical Co., Ltd. ("Chugai") was published as Patent Application No. WO2018/056453 ("'453 patent application"), which disclosed a new class of small-molecule GLP-1 receptor agonists with very potent cellular activities and in vivo efficacy based on studies conducted in monkey models of diabetes.  On June 16, 2018, weeks before Dr. W. Zhong joined QILU Regor on July 18, 2018, Pfizer publicly disclosed a third class of small-molecule GLP-1 receptor agonists Patent Application No. CA2988721, hereafter "'721 patent application," and Patent Application No. WO2018/109607, hereafter "'607 patent application").  By September 27, 2018, Eli Lilly had announced a licensing deal with Chugai based on the inventions claimed in the '453 patent application.

30.     The fact that other drug companies were actively pursuing efficacious small molecule GLP-1 receptor agonists at this time, however, proved to be a boon for Dr. W. Zhong. For example, the discovery process for potent and efficacious GLP-1 receptor agonist therapeutics became well-established and well-documented in industry literature.  Moreover, Chugai's '453 patent application contained disclosures of key results from in vivo pharmacokinetic ("PK") and efficacy studies in cynomolgus monkeys, which are well-

established gold-standard models that were readily available at a number of CROs in our industry.  Dr. W. Zhong considered this public information in his research process.  Contrary to what Counterclaim Defendant has claimed, seasoned drug hunters in the field of drug discovery for metabolic disorders know that the use of monkeys for PK in support of efficacy studies was the obvious choice for preclinical proof of concept studies.

31.     A typical drug discovery process consists of selection of a target based on a given disease; design and optimization to find a molecule that has desirable properties to intervene with that target; chemistry, manufacturing, and controls processes; and clinical development to get a drug approved for eventual commercial sale.  Of particular relevance to Dr. W. Zhong's invention claimed in the QILU Regor Patents, as explained in greater detail below, was the molecular design step.  Generally speaking, a scientist designs and synthesizes novel molecules, and tests these candidate molecules in a laboratory environment before testing the lead candidate molecules on animals, and eventually translates what he or she learned in this process to humans. It is typical to start this process with many possibly viable molecules and eventually narrow these candidates down to a specific lead compound that shows the most promise for a viable new drug and a backup lead compound, based on the results of these testing steps.

32.     Upon joining QILU Regor, Dr. W. Zhong and his colleagues visited local CROs and identified chemistry and biology CROs for chemistry synthesis and biological assay testing services, respectively.  Dr. W. Zhong also immediately began to formulate research plans for several research projects, including the small-molecule GLP-1 receptor agonist project that resulted in the agonists described in the QILU Regor Patents.  Dr. W. Zhong and his colleagues at QILU Regor were able to quickly develop the agonist compounds eventually disclosed in the QILU Regor Patents by focusing their research on areas with publicly-available information and

expediting the SAR cycle time of design and testing for drug candidates.  At larger pharmaceutical companies, typical SAR cycles can take up to two months.  Contrary to the allegations in Counterclaim Defendant's Complaint, at QILU Regor, even without internal labs, Dr. W. Zhong and his colleagues could run these cycles in about two weeks with similar effectiveness, by leveraging a network of highly efficient and competitive world-leading CROs, many of which are located within walking or short driving distances from the QILU Regor office.  In addition to the talented team of internal scientists, QILU Regor deployed a team of approximately 30 full-time equivalent (or "FTE") well trained scientists acting as an extension of Qilu Regor's own laboratories at these CROs for this project alone.  Dr. W. Zhong designed numerous novel and inventive molecules containing  various and multiple distinct chemical features and ran their SAR cycles in parallel.  This level of investment is competitive with even the largest companies in the industry.  These efforts culminated in the filing of the QILU Regor Patents and related applications with extensive genus and species coverage of GLP-1 receptor agonists.

33.     It is common practice in the pharmaceutical and biotechnology industry for a skilled medicinal chemist to start designing and synthesizing novel and inventive molecules outside of the scope of known claims based on analysis of literature in the public domain, including published patents.  It is also common practice for a medicinal chemist to synthesize one (or several) molecules described in the literature as benchmarks (also commonly referred to as controls) for comparison purposes.

34.     When starting his research at QILU Regor, Dr. W. Zhong reviewed the Pfizer GLP-1 patent application, described in Counterclaim Defendant's Complaint and published in June 2018.  One of the early steps taken in his research was to synthesize the six compounds

disclosed and specifically described in the claims of Pfizer's patent application to verify that the disclosures in Pfizer's application could feasibly produce the disclosed compounds, to better understand the scope of the claimed invention, and to use these compounds as benchmarks or references.  Dr. W. Zhong analyzed the publicly-disclosed small-molecule GLP-1R agonists, and, based on his chemistry knowledge, experience, and intuition, and the feasibility of synthesizing any possibly viable molecules, he decided to start exploring novel and inventive GLP-1 receptor agonists beyond the scope of what Pfizer's '607 patent application claimed. Based on Dr. W. Zhong's thorough analysis of the claims and their scope in the '607 patent application, he conceived numerous novel ideas and designed numerous inventive molecules that are potentially viable for new patent applications by QILU Regor.

35.     Counterclaim Defendant's claim that the invention of structurally similar compounds is evidence of trade secret misappropriation is baseless and disingenuous.  As a case in point, Steglatro, the only currently marketed diabetes drug discovered  by Pfizer, is strikingly similar to the three drugs approved earlier against the same biological target (SGLT-2), differing from Astra-Zeneca's Farxiga in only one part in the chemical structures. There are other similar examples.  Contrary to the allegations in Counterclaim Defendant's Complaint, QILU Regor's patent applications resulted from the culmination of (a) decades of scientific literature and patents in the public domain; (b) the numerous off-the-shelf biological assays available at CROs in Shanghai; and (c) Dr. W. Zhong's deep and formidable scientific expertise, broad knowledge, and skilled leadership that quickly enabled and accelerated QILU Regor's research efforts.

36.     After conceiving and designing promising agonist molecules, Dr. W. Zhong then sent lists of these molecules to CROs for synthesis.  Dr. W. Zhong leveraged his prior extensive experience working with a network of  CROs, in both (a) the synthesis of designed molecules

and (b) *in vitro* biology testing across ADME assays for further evaluation of drug-like properties.  The first of the benchmark compounds, including the six aforementioned molecules specified in the claims of the '607 patent application, was synthesized in mid-August 2018, which were used as benchmarks for QILU Regor's SAR efforts.  Taking advantage of the close proximity of the network of highly efficient CROs available to and/or created by Dr. W. Zhong, his team was able to accelerate the SAR research process, which led to the synthesis of many promising additional compounds with novel and inventive structural features in a very short period of time.  Two of the most promising agonist compounds—RGT-028 and RGT-075, exemplified as Compound 19 and Compound 28, respectively, in the QILU Regor '047 patent application—were synthesized by the chemistry CRO in September 2018 and October 2018, respectively.  The invention claimed in the '381 patent application Compound 94 in the patent application was first designed by Dr. W. Zhong in December 2018 and synthesized by his selected CRO in January 2019.

37.     Once he had begun to identify promising compounds and establish trends of structure-activity relationship, Dr. W. Zhong was anxious to begin the patent application process, because he anticipated that other drug companies were actively working to do the same.  The first provisional application of the QILU Regor Patents, Patent Application No. PCT/CN2018/117047 ("'047 patent application"), was filed on November 22, 2018.  GLP-1 agonist research was, and remains, a competitive field, particularly after the Chugai and Pfizer patents were published.  Indeed, numerous patent applications filed by many different pharmaceutical and biotechnology companies around the world have emerged in the competitive landscape, with many such applications covering small-molecule GLP-1 receptor agonists.  As expected and unsurprising to skilled medicinal chemists in the field, some of these patent

applications filed by various companies have significant overlaps in chemical structural features with each other.  In several cases, the priority dates are only separated by a few weeks or a few months.  In fact, one of QILU Regor's subsequent GLP-1-related patent applications covering a class of GLP-1 receptor agonists were likely "scooped" by another inventor who had filed an application claiming the same class of compounds a mere seven days prior.  Dr. W. Zhong's strategy for the '047 patent application was to get the patent on file as a provisional application as quickly as possible using early in vitro data, and then to subsequently amend the application to include additional promising compounds and in vivo as well as comparative data.

38.     Dr. W. Zhong's research efforts continued apace, and agonists that showed positive and encouraging *in vitro* results were selected for *in vivo* pharmacokinetics ("PK") studies in animals.    Dr. W. Zhong began PK studies on two of the most promising compounds, known by Dr. W. Zhong as RGT-028 and RGT-075, in rodents on December 29, 2018 and completed the studies on January 3, 2019.   These PK studies, as is typical, were initially conducted to determine an agonist's PK properties in rodents to enable safety studies in the species.   Subsequently, Dr. W. Zhong started monkey PK studies on January 22, 2019, to determine PK properties in support of efficacy studies, and completed the studies on January 28, 2019.  Contrary to Counterclaim Defendant's allegations in its Complaint, the lead molecules of the inventions claimed in the QILU Regor Patents all had rodent PK studies conducted prior to advancing to PK studies in monkeys.  Nor is there any truth to Counterclaim Defendant's allegations of misappropriation based on use of 418 (Pfizer's clinical candidate PF-06882961 also known as danuglipron) as the PK benchmark in monkeys.  Dr. W. Zhong's team first learned of the structure of PF-06882961 when Pfizer publicly disclosed this information at the 2019 Spring ACS National Meeting in Orlando, Florida (*see* article dated April 5, 2019:

https://cen.acs.org/pharmaceuticals/drug-discovery/Drug-structures-displayed-first-time-in-Orlando/97/web/2019/04). After that time, Dr. W. Zhong's team successfully synthesized PF-06882961, and tested its PK in rats and monkeys in April and June 2019, respectively. This occurred several months after the first provisional application of the QILU Regor Patents, the '047 patent application, which was filed in November 2018.

39. The 418 benchmark data was eventually added to the QILU Regor Patent as comparative data several months later, during the one-year period between the filing of the provisional and updated conversion patent application. Specifically, the '047 patent application was amended to include additional disclosures of novel and inventive small molecule GLP-1 receptor agonists beyond the scope of the claims in Pfizer's '607 patent application from Dr. W. Zhong's ongoing research, culminating in WO2020103815 ("'815 patent") which was published on May 28, 2020.

40. Onward from the filing of '047 patent application on Nov 22, 2018, Dr. W. Zhong and his chemistry team continued their intensive SAR for additional novel and inventive GLP-1 receptor agonists, including agonists in the same chemical series of RGT-028 and RGT-075 and in several other different chemical series with distinct chemical features from the RGT-028 and RGT-075 series. These successful research efforts led to many additional novel and inventive molecules that were included in the filings of the second provisional application of the QILU Regor Patents, Patent Application No. PCT/CN2019/082381 ("'381 patent application"), on April 12, 2019, and other QILU patent applications.

41. At no point did Dr. W. Zhong, or any other QILU Regor employee, review Pfizer confidential or trade secret materials to conceive of the inventions disclosed in the QILU Regor

Patents.  The only Pfizer materials reviewed were publicly-available information, such as published patent applications and scientific studies.

42.     Selecting the right salt and form for development of candidates is a distinct step in enabling drug development.  It is common knowledge among drug development scientists that no matter how similar molecular structures may be, each small molecule will have its own uniquely suitable salt forms for its development.  QILU Regor contracted the salt screening and selection research to a leading specialty CRO nearby, starting in June 2019.  After several months of intensive research, the CRO conducted a total of 68 salt screening experiments  for each candidate, and identified a total of 15 salt forms and 10 salt forms for RGT-028 and RGT-075, respectively, for further optimizations.  Eventually, the CRO recommended several optimal salt forms, including the Tris salt for RGT-075 and the Tris salt and the citrate salt for RGT-028, respectively, for further development in early 2020.  These innovative research results culminated in QILU Regor's filing of the PCT/CN2020/092530 patent application on May 27, 2020. This further dispels Counterclaim Defendant's assertion that QILU Regor used Pfizer's alleged trade secrets or confidential information to accelerate its discovery program.

## IV.     Dr. Qiu and Dr. M. Zhong's Departures From Pfizer and Work at QILU Regor

43.     Dr. Qiu and Dr. M. Zhong's departure from Pfizer was not motivated by any illicit or improper motive. Over their many years at Pfizer, Dr. Qiu and Dr. M. Zhong grew dispirited.  As managers, they grew increasingly distressed by the rounds of firings and headcount reductions they were responsible for implementing and absorbing at the direction of Pfizer's leadership.[3]  In addition, over his nineteen years of loyal service at Pfizer's legacy

---

[3]  *See* https://www.courant.com/business/hc-xpm-2011-02-01-hc-pfizer-layoffs-groton-0202-20110201-story.html.

research organizations, Dr. M. Zhong and his family relocated twice, from Kalamazoo, Michigan to Ann Arbor, Michigan in 2003, and from Ann Arbor, Michigan to Groton, Connecticut in 2007. Dr. M. Zhong's relocations were also part of Pfizer reorganizations that were implemented following multiple rounds of mergers and acquisitions. These reorganizations also featured multiple rounds of massive layoffs.  During his tenure at Pfizer, Dr. M. Zhong witnessed the firing of over 1,000 highly talented research staff, colleagues and friends in Kalamazoo through 2003, and over 2,000 similarly highly trained and talented research staff in Ann Arbor through 2007, and as a manager had to personally deliver the messages terminating his own team members after Pfizer's leadership had made the decisions.

44.     Dr. M. Zhong moved to Groton in 2007 believing that Pfizer was committed to investing more in its own research and science to fulfill its promise to help people live a healthy life.  But to his great dismay, the pattern of layoffs continued unabated through the day he resigned.  Between 2007 and 2018, Both Dr. Qiu and Dr. M. Zhong endured the massive reduction of about 5,000 research and development staff from Pfizer's Groton and New London sites.  Each of the Pfizer communities in Kalamazoo, Ann Arbor, New London and Groton joined were left devastated by this unrelenting practice.  Both Dr. Qiu and Dr. M. Zhong felt that talented individuals across key Pfizer research and development programs were needlessly let go, as they watched the approximately 8,000 research and development employees in Pfizer's Groton and New London offices shrink to fewer than 3,000 employees by the end of 2017.  The wave of layoffs in December 2017 was the last straw for Dr. M. Zhong and Dr. Qiu.

45.     During this time, Pfizer increasingly came to rely on acquisitions and commercialization agreements with other drug companies more dedicated to research in order to bring new drugs to market.  Dr. Qiu and Dr. M. Zhong both preferred to contribute to a company

focusing on innovative drug discovery efforts, as they had observed colleagues in smaller biotech companies inventing and developing new drugs, including Dr. Xiaotian Zhu who became one of QILU Regor's founders.  Both finally realized that they could do more good outside of Pfizer. With this in mind, they decided to explore alternative job opportunities, including the option to form an innovative biotechnology company that would become QILU Regor in July of 2018. Dr. Qiu resigned from Pfizer on June 12, 2018, the first day he qualified for early retirement.  Dr. M. Zhong resigned the same day.

46.     Dr. Qiu and Dr. M. Zhong had decades of experience regarding the business and operational aspects of drug discovery.  This experience was highly valuable to a new organization such as QILU Regor.

47.     Dr. Qiu and Dr. M. Zhong's roles at Pfizer, as directors overseeing the stages of new drug development, involved the selection of projects to fund and the allocation of resources. Specifically, during his time at Pfizer, Dr. Qiu, as an executive director, simultaneously supervised over 50 scientists and oversaw about 25 research programs across all of Pfizer's research and development sites on the east coast (but not Pfizer's oncology research programs on the west coast).  Pfizer's GLP-1 program was just one of these programs.  Further, as Executive Director for Structural and Molecular Sciences, Dr. Qiu was responsible for strategic investments in new technology.  He oversaw the prioritization and distribution of resources, but he was not involved in the day-to-day research activities of any given project, including GLP-1.

48.     Dr. M. Zhong's last role at Pfizer was Director of Clinical Outsourcing in Pfizer's Pharmacokinetics, Dynamics & Metabolism ("PDM") group.  In this role, Dr. M. Zhong managed external resources on behalf of PDM, and reviewed the CROs' work and study results for regulatory submissions.  Accordingly, he was generally aware of the activities across Pfizer's

PDM group. However, like Dr. Qiu, Dr. M. Zhong was not involved in the day-to-day research activities of the various projects in his group.

49. Dr. Qiu and Dr. M. Zhong were not involved in Pfizer's GLP-1 patent application during their employment at Pfizer, and only became aware of its contents upon its June 2018 publication.

50. During the time of the synthesis and testing of the compounds being developed by Dr. W. Zhong at QILU Regor, Dr. Qiu and Dr. M. Zhong were focused on the business development efforts of QILU Regor. These efforts included fundraising and pursuing partnership opportunities, such as the collaboration eventually formed with Eli Lilly. Based on their history in the pharmaceutical industry, Dr. Qiu and Dr. M. Zhong provided high-level strategy and resource guidance on the above-described research activities of Dr. W. Zhong that guided the accelerated drug discovery described above. Leveraging his extensive experience working with CROs, Dr. M. Zhong was also responsible for providing guidance and supervision as to the resources and timelines of multiple programs and studies at various CROs.

51. Dr. Qiu and Dr. M. Zhong were involved in the strategy of QILU Regor to pursue GLP-1 agonists. However, QILU Regor's corporate strategy was made based on publicly available information and eventually endorsed by their investors. As described above, it is public knowledge that GLP-1 agonists are effective against diabetes, and there is an obvious market demand for a GLP-1 oral medication, as Counterclaim Defendant describes in its Complaint. No confidential information from Counterclaim Defendant was necessary to make this decision. General corporate strategy is within the responsibilities of Dr. M. Zhong and Dr. Qiu, but the inventions of QILU Regor's small molecule GLP-1 receptor agonists were entirely conceived and invented by Dr. W. Zhong and his chemistry team at QILU Regor, and scientific

ideas and daily execution of the research were entirely the responsibility of Dr. W. Zhong and his team.

## V.    Pfizer's Unreasonable Delay in Filing This Action

52.    Pfizer unreasonably delayed in bringing this suit.  Pfizer did not express any concerns over Dr. M. Zhong or Dr. Qiu's departures until over three years after their departures from Pfizer.  Indeed, Pfizer made no allegations against Dr. M. Zhong or Dr. Qiu until after QILU Regor began to show promising signs of success.

53.    Pfizer's unreasonable delay in bringing this suit harmed QILU Regor.  When Dr. M. Zhong and Dr. Qiu left Pfizer in mid-2018 and shortly afterwards, Pfizer had access to much of the information on which this lawsuit is based.  In particular, Pfizer had possession of the same devices and electronic records necessary for the forensic analyses alleged in the Complaint. Further, Pfizer was aware (or at least could easily have discovered) that Dr. M. Zhong and Dr. Qiu began working for Regor shortly after their departures from Pfizer.  Dr. M. Zhong and Dr. Qiu's potential to compete after leaving Pfizer was obvious and readily available to the public in the summer of 2018, as evidenced by their LinkedIn profiles and the corporate entities registered, and presumably known to Pfizer even earlier.  But, nevertheless, Pfizer did not bring suit, or in any way put QILU Regor on notice that Pfizer had purported questions regarding Dr. M. Zhong's and Dr. Qiu's business activities.  Nor did Pfizer make any attempt at mitigation before filing suit, such as requesting return of any inadvertently retained materials, even if Pfizer had any basis for doing so.

54.    QILU Regor reasonably relied on Pfizer's delay, and has been harmed by this reliance.  It was reasonable for QILU Regor to rely on Pfizer's inaction here, given Pfizer's contemporaneous access to information surrounding Dr. M. Zhong's and Dr. Qiu's departures

from Pfizer and work at QILU Regor.  QILU Regor reasonably interpreted Pfizer's silence and

inaction as indicative that Pfizer had no valid concerns or issues with respect to the

circumstances regarding Dr. M. Zhong and Dr. Qiu's departures from Pfizer or work for QILU

Regor.  In the intervening years, QILU Regor spent years and significant resources investing in

developing a drug for the GLP-1 receptor.  Had Pfizer timely filed the claims set forth in its

Complaint, QILU Regor could have had the opportunity to address any purported issues raised

by Pfizer promptly.  Had QILU Regor known in a timely manner that Pfizer had valid concerns,

QILU Regor could have factored this information into its determination of whether to invest

significant time and resources in developing a drug for the GLP-1 receptor, as opposed to other

targets.  Likewise, Eli Lilly could have factored this information into its collaboration with QILU

Regor.  QILU Regor's detrimental reliance on Pfizer's unreasonable delay should weigh strongly

against finding liability.

## FIRST COUNTERCLAIM:
### Declaratory Relief That Defendants Did Not Misappropriate Pfizer Trade Secrets

55.     The Regor Parties (QILU Regor, Regor Therapeutics, Inc., Dr. Qiu, and Dr. M.

Zhong) repeat and re-allege each and every allegation, defense, and response set forth above with

the same force and effect as if fully restated herein.

56.     The Defend Trade Secrets Act ("DTSA") defines a trade secret as "financial,

business, scientific, technical, economic, or engineering information" that "(A) the owner thereof

has taken reasonable measures to keep . . . secret; and (B) . . . derives independent economic

value, actual or potential, from not being generally known to, and not being readily ascertainable

through proper means by, another person who can obtain economic value from the disclosure or

use of the information."  18 U.S.C. § 1839(3).

57. Similarly, the Connecticut Uniform Trade Secrets Act ("CUTSA") defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  C.G.S.A. § 35-50 *et seq*.

58. Under both the DTSA and the CUTSA, "misappropriation" is (1) the "[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;" or (2) the "[d]isclosure or use of a trade secret of another without express or implied consent."  18 U.S.C. § 1839(5); C.G.S.A. § 35-50 *et seq*.

59. Dr. M. Zhong and Dr. Qiu did not improperly access any trade secrets in preparing to leave their employment at Pfizer for QILU Regor.  Information that Dr. M. Zhong and Dr. Qiu accessed while employed by Pfizer and preparing for employment at QILU Regor was generally available to the public and/or readily ascertainable in the industry, and therefore not a trade secret.  To the extent that any non-public information was accessed, that information was not subject to reasonable efforts to maintain its secrecy, and therefore is not a trade secret.  Further, to the extent Dr. M. Zhong and Dr. Qiu were in passive possession of Pfizer trade secrets as part of their prior employment, these trade secrets were not improperly acquired, but were instead legitimately acquired in connection with their work at Pfizer, which cannot constitute trade secret misappropriation under applicable law.  Further, such trade secrets were never shared or used for the benefit of QILU Regor or by the Regor Parties for any other wrongful purpose.  Lastly, Counterclaim Plaintiffs do not have possession of any Pfizer trade secrets.

60.     Moreover, neither Dr. M. Zhong, Dr. Qiu, nor any of the Regor Parties used any Pfizer trade secret in developing QILU Regor's technology and inventions.  Instead, the Regor Parties' technology and inventions were conceived and developed independently by researchers based in mainland China.  As such, there simply was no misappropriation.  Instead, it appears that Pfizer's lawsuit is a bad faith and opportunistic attempt at stifling legitimate competition and robbing the fruits of QILU Regor's investments, ingenuity and hard work.

61.     An actual, continuing, and justiciable controversy exists between the Regor Parties and Pfizer regarding whether the Regor Parties misappropriated Pfizer's trade secrets.  Absent a declaration that the Regor Parties did not misappropriate trade secrets, Pfizer will continue to wrongfully assert ownership of the QILU Regor Patents, which assertion is not designed to protect Pfizer's trade secrets but is instead designed to stifle competition, and which will continue to cause QILU Regor injury and damage, including by casting an improper and artificial dark shadow on the Regor Parties' business.  Further, this issue stretches beyond just the allegations raised in Pfizer's complaint: absent a declaration that the Regor Parties did not misappropriate any Pfizer information, Pfizer may in the future raise similar claims about subsequent QILU Regor patents and technology.  As such, the Regor Parties seek a declaration as to not just the trade secrets alleged by Pfizer, but also as to any trade secrets to which Dr. M. Zhong and Dr. Qiu had access during their Pfizer employment.

62.     A judicial declaration is necessary and appropriate at this time.  As Pfizer describes in its Complaint, the Regor Parties are involved in an ongoing collaboration with Eli Lilly, which includes a license to the QILU Regor Patents.  Unless the Regor Parties obtain from this Court a declaratory judgment clearing the air of allegations of trade secret misappropriation, the Regor Parties face significant harm, as Pfizer's allegations prevent the Regor Parties from

using or licensing their technology and inventions, and introduce needless uncertainty into their existing licensing relationships, including with Eli Lilly.

63.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the Regor Parties request a judicial determination and declaration that the Regor Parties did not misappropriate Pfizer trade secrets.

**SECOND COUNTERCLAIM:**
**Declaratory Relief That Defendants Min Zhong and Xiayang Qiu Did Not Breach Their**
**Employment Contracts With Pfizer Or Breach Other Duties Owed To Pfizer**

64.     The Regor Parties repeat and reallege each and every allegation, defense, and response set forth above with the same force and effect as if fully restated herein.

65.     Dr. M. Zhong and Dr. Qiu did not improperly use or disclose any of Pfizer's "inventions, improvements, confidential information and trade secrets" during or after the course of their employment with Pfizer.  Defendants Dr. M. Zhong and Dr. Qiu therefore did not breach any contract prohibiting such activity.  Further, to the extent Dr. M. Zhong and Dr. Qiu were in passive possession of Pfizer confidential information as part of their prior employment, such information was legitimately acquired in connection with their work at Pfizer.  To the extent this constitutes a technical breach of their contractual obligations, it caused no appreciable harm to Pfizer, as Dr. M. Zhong and Dr. Qiu did not use any such information to compete against Pfizer.

66.     Pfizer made no attempt at mitigation before filing suit, such as requesting return of any inadvertently retained materials.  This was despite the fact that Dr. M. Zhong's and Dr. Qiu's competitive potential was obvious and readily available to the public in the summer of 2018, as evidenced by their LinkedIn profiles and the corporate entities registered, if not known to Pfizer earlier.

67.     Pfizer unreasonably delayed in bringing this suit.  Pfizer waited for 45 months after Dr. M. Zhong and Dr. Qiu resigned from Pfizer to bring this suit.  Pfizer waited to bring this suit until well after QILU Regor began showing signs of success in clinical trials, and well after the Counterclaim Defendant concedes that Pfizer had become suspicious of misappropriation of their trade secrets in May 2020, after QILU Regor's '815 patent had been published.

68.     Dr. M. Zhong and Dr. Qiu did not breach their invention assignment obligations, as they did not conceive of the QILU Regor inventions to begin with, much less during their time as Pfizer employees.  As Pfizer concedes, the assignment provisions in Dr. Qiu's contract only apply to inventions "conceived, made or developed by" him "during the period of" employment. Similarly, Dr. M. Zhong's contract applies only to inventions "conceived or reduced to practice" by him while employed by Pfizer.

69.     QILU Regor's patents were neither developed by Dr. M. Zhong and Dr. Qiu, nor developed during their time of employment at Pfizer.  Rather, the patents were independently developed by researchers based in QILU Regor's offices in mainland China—all of which occurred *after* Dr. M. Zhong and Dr. Qiu were no longer employed by Pfizer.  Therefore, Dr. M. Zhong and Dr. Qiu did not breach their employment contracts by failing to assign these inventions and patents.  Put simply, Pfizer has no right to assignment of technology developed by non-Pfizer employees, and certainly not where Dr. M. Zhong and Dr. Qiu had already resigned from Pfizer when the inventions were conceived and developed.

70.     Dr. M. Zhong and Dr. Qiu further did not breach their fiduciary duties or duty of loyalty to Pfizer. To the extent they made preparations to form QILU Regor while employed by Pfizer, this was a valid exercise of their right to prepare to compete that is enshrined under

applicable law.  However, neither Dr. M. Zhong nor Dr. Qiu actually began competing until after their Pfizer employment was terminated.  As such, neither Dr. M. Zhong nor Dr. Qiu breached their contracts nor violated their fiduciary duties or duty of loyalty.

71.    An actual, continuing, and justiciable controversy exists between the Regor Parties and Pfizer regarding whether Dr. M. Zhong and Dr. Qiu breached their employment contracts with, or duties to, Pfizer.  Absent a declaration that Dr. M. Zhong and Dr. Qiu did not breach their contracts or violate other employment duties, Pfizer will continue to wrongfully assert ownership of the QILU Regor Patents, and will continue to cause the Regor Parties injury and damage.  Further, this issue stretches beyond just the allegations raised in Pfizer's complaint: absent a declaration that Dr. M. Zhong and Dr. Qiu did not breach any duties or contractual obligations to Pfizer, Pfizer may in the future raise similar claims about subsequent QILU Regor patents and technology.  As such, the Regor Parties seek a declaration as to not just the allegations raised by Pfizer, but also as to any duty or obligation that Dr. M. Zhong and Dr. Qiu owed to Pfizer in connection with their employment, as applied to any technology developed by the Regor Parties.

72.    A judicial declaration is necessary and appropriate at this time.  As Pfizer describes in its Complaint, the Regor Parties are involved in ongoing collaboration with Eli Lilly which includes a license to the QILU Regor Patents.  Unless the Regor Parties obtain from this Court a declaratory judgment clearing the air of allegations of trade secret misappropriation, the Regor Parties face significant harm, as Pfizer's allegations prevent the Regor Parties from using or licensing their technology and inventions, and introduce needless uncertainty into their existing licensing relationships, including with Eli Lilly.

73.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the Regor Parties request a judicial determination and declaration that Dr. M. Zhong and Dr. Qiu did not breach any contractual obligations or employment duties owed to Pfizer, including their fiduciary duties and the duty of loyalty, as applied not only to the subject matter asserted in Pfizer's complaint, but also to any other subject matter or technology that may be implicated by Dr. M. Zhong's and Dr. Qiu's Pfizer employment duties.

### THIRD COUNTERCLAIM:
### Declaratory Relief That Qilu Regor Is The Sole Owner Of The Qilu Regor Patents And Defendants Have No Obligation To Assign Any Inventions Or Patent Rights To Pfizer

74.     The  Regor Parties repeat and reallege each and every allegation, defense, and response set forth above with the same force and effect as if fully restated herein.

75.     As Pfizer concedes in its complaint, the assignment provisions in Dr. Qiu's contract apply only to inventions "conceived, made or developed by" him "during the period of" employment.  Similarly, the assignment provisions in Dr. M. Zhong's contract only apply to inventions "conceived or reduced to practice" by him while employed by Pfizer.

76.     The Regor Parties did not use Pfizer's trade secrets to conceive or develop their technology, inventions, and patent applications.  Rather, QILU Regor performed its own independent research at great cost, deploying a talented team of researchers based in mainland China to identify compounds and conceive of the inventive material claimed in the patents—all of which occurred after Dr. M. Zhong and Dr. Qiu were no longer employed by Pfizer.

77.     Furthermore, Dr. M. Zhong and Dr. Qiu were not even involved in the aforementioned work that led to QILU Regor's patents that occurred in mainland China, and they certainly did not conceive or develop an assignable invention during their employment with Pfizer.  Instead, Dr. M. Zhong and Dr. Qiu are focused on the business-side of QILU Regor's

operations.  No confidential scientific information from Pfizer was ever used to develop QILU

Regor's inventions.  There is therefore no basis for assignment of QILU Regor's patents to

Pfizer.

78.      To the extent that there is overlap or similarities between QILU Regor's

inventions and Pfizer's research initiatives, this is because (1) QILU Regor relied on publicly-

available knowledge to guide its research; and (2) it is common practice to use compounds from

publicly available literature and published patents as chemical starting points to build novel and

inventive chemical structures with drug properties.  Such efforts from different companies often

come up with strikingly similar or identical molecules.  For instance, Pfizer's only diabetes drug,

Steglatro, the fourth SGLT2 inhibitor introduced into the market, is strikingly similar to

previously-approved drugs, and differs from Astra-Zeneca's Farxiga at only one part in its

chemical structure.   This drug was presumably the result of legitimate competition, despite the

similarities.

79.      An actual, continuing, and justiciable controversy exists between the Regor

Parties and Pfizer as to QILU Regor's ownership of the QILU Regor Patents, evidenced by

Pfizer's competing claim for assignment of the Patents.  Specifically, Pfizer contends that it

owns or is owed assignment of the QILU Regor Patents, whereas the Regor Parties dispute this

contention and contend that QILU Regor alone owns the QILU Regor Patents. Valuable legal

rights arising from ownership of the QILU Regor Patents are directly and substantially affected

by this controversy.  Absent a declaration that (1) QILU Regor is the sole owner of the QILU

Regor Patents; and (2) the Regor Parties have no obligation to assign said patent rights to Pfizer,

Pfizer will continue to wrongfully assert ownership of the QILU Regor Patents against the Regor

Parties, and will continue to cause or threaten to cause Defendants appreciable injury and damage.

80.     A judicial declaration is necessary and appropriate at this time.  As Pfizer describes in its Complaint, the Regor Parties are involved in an ongoing collaboration with Eli Lilly, which includes a license to the QILU Regor Patents.  Unless the Regor Parties obtain from this Court a declaratory judgment of QILU Regor's sole ownership of all rights, title, and interests in the QILU Regor Patents, the Regor Parties will face significant harm, as Pfizer's allegations of ownership and duty to assign the QILU Regor Patents prevents the Regor Parties from using or licensing their inventions, and introduce needless uncertainty into their existing licensing relationships, including with Eli Lilly.

81.     Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the Regor Parties therefore request a judicial determination and declaration that QILU Regor is the sole owner of the QILU Regor Patents (and any other applications or patents that may issue based on Pfizer's improper claims regarding ownership and assignment), and a declaration that the Regor Parties have no duty to assign their patent rights to Pfizer.

## PRAYER FOR RELIEF

Wherefore, the Regor Parties pray for the following relief:

A.     A declaration that the Regor Parties did not misappropriate any Pfizer trade secrets;

B.     A declaration that Dr. M. Zhong and Dr. Qiu did not breach their contracts with, or duties owed to, Pfizer;

C.     A declaration that (i) QILU Regor is the sole owner of all rights, title, and interests in the QILU Regor Patents, and any other applications or patents that may issue based on

or claiming priority to the same; and (ii) the Regor Parties are under no obligation to assign any of their inventions, patents, or technology to Pfizer;

D.      Dismissal of Pfizer's Complaint in its entirety, with prejudice;

E.      An award of reasonable attorneys' fees and costs to the Regor Parties to the extent permitted by law, including with regard to Pfizer's bad faith claims for trade secret misappropriation; and

F.      Such further relief as this Court may deem just and proper.


DATED:  March 18, 2022                    Respectfully submitted,
                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                    By  /s/ Andrew Berdon
                                        Andrew Berdon
                                        Mark Tung
                                        51 Madison Avenue, 22nd Floor
                                        New York, NY 10010
                                        Tel:  212-849-7000
                                        Fax:  212-849-7100
                                        andrewberdon@quinnemanuel.com
                                        marktung@quinnemanuel.com


                                    PULLMAN & COMLEY, LLC


                                    By: /s/  Dana M. Hrelic
                                        Dana M. Hrelic, Esq. – ct28168
                                        Pullman & Comley, LLC
                                        850 Main Street P.O. Box 7006
                                        Bridgeport, CT  06601-7006
                                        Telephone 203 330 2000
                                        Facsimile 203 576 8888
                                        E-mail:  DHrelic@pullcom.com